2000 OK 44

Richard David WHITE, Petitioner–
Appellant,

v.

In the Matter of the ADOPTION OF
BABY BOY D., a/k/a R.D.W., Chosen
Child Adoption Agency, Inc., Wayne and
Nancy Doe and R.D.W., a Minor Child,
Respondents–Appellees.

No. 93621.

Supreme Court of Oklahoma.

June 13, 2000.

Rehearing Denied Sept. 12, 2000.

Michael Scott Ashworth, Tulsa, Oklahoma, For Petitioner/Appellant Richard David White.

Catherine L. Campbell and Matthew B. Free of Best & Sharp, Tulsa, Oklahoma, For Respondents/Appellees, Intervenors Wayne and Nancy Doe.

Denny Johnson, Tulsa, Oklahoma, For Baby Boy D., a/k/a R.D.W., a Minor Child.

April D. Parnell of Herrold, Herrold, Sutton & Davis, P.A., Tulsa, Oklahoma, for Respondent/Appellee Chosen Child Adoption Agency, Inc.

WINCHESTER, Justice:

¶ 1 This matter concerns an appeal from the order of the district court of Tulsa County wherein the court determined it had subject matter jurisdiction over the proceedings and that unwed biological father's parental rights should be terminated pursuant to Title 10 O.S.Supp.1999, 7505–4.2(C)(1) and § 7505–2.1(D)(2) and the minor child, Baby Boy D., a/k/a R.D.W., be declared eligible for adoption. The parties to this appeal are the biological father (Petitioner), Chosen Child Adoption Agency, Inc. (Agency) and the minor child (Baby) (respondents/appellees), and

prospective adoptive parents (Does/Intervenors).

## FACTS

¶ 2 In the proceedings before the trial court, conflicting testimony abounded. The record before us contains an abundance of evidence, including testimony reflected in transcripts of the trial court's proceedings in the instant matter, that supports the trial court's order terminating Petitioner's parental rights and declaring Baby eligible for adoption. Baby Boy D., a/k/a R. D.W. (Baby) was born out of wedlock on March 6, 1999, in Overland Park, Kansas, to Chiquita Darrington (biological mother). The biological mother is a resident of Kansas City, Missouri. Richard David White, biological father and Petitioner herein, also resides in Kansas City, Missouri. The two are not married and never have been. They do not live together. Petitioner never offered to marry the biological mother and never told her that he wanted custody of Baby until after the birth. Petitioner did not offer to pay for prenatal care for the biological mother, although he knew from previous experience with the mothers of his other children that prenatal care was important and valuable to mothers and their babies. Nor did Petitioner encourage the biological mother to seek prenatal care or offer to take her to a doctor for such care, although he was aware of particular physicians which the mothers of his other children had visited for prenatal care. To date, Petitioner's and the biological mother's acquaintance has given rise to three pregnancies, one of which resulted in an abortion that Petitioner helped fund, one in a miscarriage, and the third, in Baby. Petitioner and the biological mother continued to have a physical relationship after Baby's birth, although Petitioner was living with his fiancé. Evidence at the final hearing before the trial court indicated the biological mother believed Petitioner recently had impregnated her for a fourth time.

¶ 3 The biological mother also has a two-year-old daughter, whom Petitioner originally believed was his. Petitioner gave the biological mother between four and five thousand dollars ($4000.00—$5,000.00) to support her during the pregnancy of this other child and during the first year of the child's life. The biological mother informed Petitioner the child was fathered by Jo–Jo or Joseph, and eventually he believed her, but continued to give cash during that one year period.

¶ 4 During the biological mother's pregnancy with Baby, Petitioner was engaged to another woman whom he also had impregnated. This woman gave birth to a daughter approximately four months before the biological mother gave birth to Baby. Petitioner currently lives with this woman, her daughter by another man, and their newborn daughter.

¶ 5 Prior to the birth of the baby girl Petitioner had with his fiancé, they terminated their relationship on several occasions and Petitioner forced her to move out of his residence with her older daughter. During at least two of these periods, prior to Baby's birth, the biological mother moved in with Petitioner. Petitioner and the biological mother experienced discord and when this occurred he forced her and her two-year-old daughter to move out. His fiancé and her older daughter then moved back in with Petitioner.

¶ 6 Testimony revealed several incidents of violence between Petitioner and the biological mother. When she was pregnant with her daughter, she discovered Petitioner in bed with another woman. On this occasion, the biological mother kicked over Petitioner's motorcycle. On another occasion, while the biological mother was pregnant with her daughter, Petitioner informed the biological mother he had pawned a gold necklace she owned to purchase a ring for his fiancé. The biological mother threw a brick at Petitioner but missed him and hit his 1995 Nissan Pathfinder. Petitioner then called the police and had her arrested. One of the biological mother's friends testified that she had witnessed Petitioner physically attack the biological mother. Due to Petitioner's size, this friend had interfered in the altercation and "pulled him off" the biological mother. The biological mother also testified Petitioner physically struck her six times and that when she was pregnant with her daughter, Petitioner kicked her in the stomach. The bio-

logical mother testified she went to the hospital to obtain medical attention after this attack by Petitioner.

¶ 7 Petitioner's house is owned by his father, who purchased it so that Petitioner and his fiancé would have a place to live with their newborn daughter. Petitioner pays his father rent, which is assessed at four hundred dollars per month ($400.00), although he frequently does not pay the full amount.

¶ 8 The biological mother did not have the financial resources to support herself when she became pregnant with Baby. Petitioner did not provide her financial support, shelter and other basic necessities even when she was evicted from her Missouri residence. Petitioner testified he gave the biological mother cash in the amount of approximately six hundred dollars ($600.00), for which he had no receipts, and a few chicken dinners. The biological mother initially contemplated having an abortion, but Petitioner refused to help her pay for another one. Therefore, shortly after conception, she moved to Texas to live with her grandmother. At this point, the biological mother began to entertain thoughts of adoption. During her tenure in Texas, Petitioner was aware of her address and telephone number. In fact, he had numerous telephone conversations with her. However, Petitioner failed to provide any support, financial or otherwise, to the biological mother while she was living in Texas although he knew she was in desperate need of money.

¶ 9 The biological mother returned to Kansas City, Missouri, in February 1999, just prior to Baby's birth. Petitioner continued to live with the other woman, his fiancé. Testimony indicated the fiancé argued with the biological mother and threatened her as well as Baby, although Petitioner contended his fiancé agreed to help him rear Baby after her initial shock subsided from learning the biological mother was pregnant with Petitioner's child. Petitioner failed to demand that his fiancé appear in court and testify to demonstrate her alleged willingness to help him rear Baby and to rebut testimony regarding the fiancé's anger and resentment toward the biological mother and Baby.

¶ 10 When Baby was born, the biological mother notified Petitioner and he came to the hospital with his brother, who also testified at the proceedings before the trial court. Petitioner maintained he had purchased some outfits for Baby, along with a receiving blanket and a few other items, which he brought to the hospital. The biological mother testified Petitioner brought nothing for Baby. In any event, he could not produce a receipt for any items and testified that he did not leave the outfits with the biological mother so that Baby actually could make use of them. During one hospital visit, Petitioner noticed a rose that a male friend of the biological mother had given her. He became enraged, verbally abused Mother with expletives and destroyed the rose.

¶ 11 The biological mother again contemplated adoption and spoke with a woman from a Kansas adoption agency at the hospital. Later, she changed her mind because Petitioner assured her he would help care for Baby. They then informed hospital officials they intended to rear the child together, alternating care (days and nights) because the biological mother worked nights and Petitioner worked days. At some point, contrary to this joint arrangement, the Petitioner and the biological mother agreed he would take sole custody of Baby. While at the hospital, personnel asked Petitioner to sign paternity papers so that they could prepare Baby's birth certificate and he declined to do so. Petitioner did not file a petition to determine paternity and obtain custody of Baby prior to birth or immediately thereafter. He also failed to file a paternity instrument with a paternity registry prior to the time Agency filed its initial petition to terminate parental rights.

¶ 12 On March 8, 1999, Petitioner took the biological mother and Baby to her residence in Kansas City, Missouri. Petitioner agreed to return at six o'clock that evening, to care for Baby several hours so the biological mother could rest. Petitioner failed to return at the designated time and thereby failed to appear to care for Baby on the one evening he had agreed to do so. He called at seven o'clock the evening of March 8, 1999, and told the biological mother he would not

be there to relieve her. During this telephone conversation, the biological mother informed Petitioner that her current refrigerator would not keep Baby's formula cold and asked him to purchase one. He declined and said he might pay one-half of the cost if the father of her two-year-old daughter would pay the other half. He also told her he would do nothing until he was certain that he was Baby's biological father. At no time did Petitioner pay or offer to pay child support to the biological Mother for Baby, to establish his willingness to help in rearing his son. Petitioner never took Baby to the doctor and never provided medical insurance coverage for Baby. In addition, Petitioner did not pay for or offer to pay for any of the medical expenses of the biological mother or Baby associated with Baby's birth or thereafter.

¶ 13 The biological mother called the male friend who had given her the rose in the hospital and he brought diapers, formula and other baby items to her residence. She realized she could not depend on Petitioner to help her rear Baby or to provide financial support. She found a 1–800 phone number in the yellow pages of the Kansas City phone directory for Chosen Child Adoption Agency, Inc. (Agency), located in Tulsa. The next day, March 9, 1999, she brought Baby to Tulsa to initiate the adoption process. She informed Agency that she was unsure of Baby's father's name or location, but that he could be a man named Jo–Jo or Joseph, or someone else. At the time, she did not know the father's identity to a certainty, although she suspected Petitioner. She relinquished her parental rights to Baby and left Oklahoma.

¶ 14 Subsequently, Petitioner learned of her actions and filed an Application for Emergency Temporary Order on March 17, 1999, in the district court of Tulsa County, to keep Baby in the state of Oklahoma pending a custody determination. Baby already had left the state for Idaho, where the prospective adoptive parents (Does/Intervenors) reside.

While proceedings were pending before the Tulsa County trial court, Petitioner told the biological mother that if he obtained custody of Baby, she could visit Baby only if she allowed him to exercise sexual privileges with her and that he would seek child support payments from her, to support Baby. He also raided her mailbox and stole various items from it, including Baby's social security card and Medicare documents, in an attempt to intercept and cash in on checks which he mistakenly believed Agency had sent as an incentive to place Baby for adoption.

¶ 15 Petitioner testified that there were no child support enforcement orders against him pending in any state, but the evidence revealed that the mother of his oldest daughter had obtained an order against him in the state of Missouri, and he had not paid the required child support to her. Petitioner testified he did not even know the telephone number of the custodial mother of this daughter for several months. Petitioner testified that he paid a veterinarian for medical expenses associated with his dog but that he did not provide medical insurance for any of his children. The evidence established that Petitioner pays no regular child support payments and offers no regular financial support for his children who do not live with him. Similarly, evidence established that Petitioner did not attempt to provide any support, financial or otherwise, to Baby while Baby was at the Agency or afterward, when Baby was placed with the potential adoptive parents.

¶ 16 Petitioner also testified regarding his taxable income, which he stated to the trial court varied but usually amounted to six hundred dollars ($600.00) a week more or less, which would have totaled twenty-eight thousand eight hundred dollars ($28,800.00) per year. However, on his 1998 IRS tax form, Petitioner claimed an income of only eight thousand dollars ($8,000.00) for the year.

¶ 17 Petitioner filed a Petition for Determination of a Father/Child Relationship that was file-stamped May 13, 1999, in the Circuit Court of Jackson County, Missouri, Family Court Division. The petition filed in Missouri stated that Baby was in the state of Oklahoma and subject to a pending adoption without Petitioner's consent. However, it also stated in ¶ 6, Count II, that Petitioner

"has not participated in any other litigation concerning the custody of Petitioner Child in this or any other state." The evidence before the trial court established that Petitioner filed this petition in Missouri over one month after he had appeared for the first time before the Oklahoma trial court and had participated in the Oklahoma litigation concerning the custody of Baby. When asked by Agency's counsel about this inconsistent averment in the Missouri petition, Petitioner merely said he signed the petition not knowing its contents.

¶ 18 Petitioner provided photographs to the trial court as exhibits of a nursery in his home, complete with crib and infant's swing, which he testified would belong to Baby. During cross examination, counsel for Baby discovered that the nursery depicted in these photographs actually belonged to Petitioner's and his fiancé's four-month-old daughter. When questioned, Petitioner testified he planned to admit this if asked, and that his daughter's nursery was big enough for another baby. He then confessed he had done nothing to prepare the room for Baby's arrival and had failed to purchase any necessary items for Baby, such as a crib and infant's swing. He also testified he never opened a separate bank account, checking or savings, to provide financial support for Baby.

¶ 19 In an effort to discourage the biological mother from testifying to his detriment before the trial court, Petitioner told her that authorities would arrest her if she appeared at the proceedings after her March 9, 1999, relinquishment of parental rights. He also threatened her if she did so. Nonetheless, she appeared and testified at the hearing on termination of Petitioner's parental rights and at the best interests hearing. She did so because she believed it was in Baby's best interests to be placed with adoptive parents Does/Intervenors and not with Petitioner.

¶ 20 At some point in time after the biological mother terminated her parental rights before the trial court, Petitioner obtained four hundred dollars ($400.00) from Baby's maternal grandmother to fight the adoption. He signed a paternity affidavit and submitted to a blood test which confirmed to a reason-able certainty that he was the biological father of Baby.

¶ 21 The evidence established the following facts about the prospective adoptive parents: The prospective adoptive mother has a bachelor's and master's degree in early childhood education and development. Her husband of thirteen years is a teacher and has similar degrees. She owns her own day care center and is with Baby on a daily basis at her care facility.

¶ 22 Baby has severe health problems, including a swallowing disorder termed a class IV reflux, and substantial hearing loss in his left ear. The former requires constant attention and administration of medicine seven times a day. The hearing loss requires periodic monitoring and will require speech therapy and additional medical intervention in the future. The adoptive parents provide medical insurance for Baby. They take Baby to numerous doctors' appointments, including specialists who practice a significant distance from their home. The adoptive mother administers his medication and constantly monitors him at her day care center. The adoptive parents take turns feeding him when he awakens during the night.

¶ 23 At the time of the August 31, 1999, best interests hearing, the adoptive parents were married one month shy of thirteen years. Their two adopted daughters, both African–American, were ages three and four. Their two natural sons, both Caucasian, were ages sixteen and twenty-one. The older son attended college and lived at home. The adoptive parents attended classes regarding the issues they faced as a bi-racial family, to further promote a healthy, stable environment for their two adopted daughters and for Baby, who is African–American.

## PROCEDURAL HISTORY

¶ 24 The instant matter is before the Court on appeal from the trial court's order terminating the parental rights of natural father, Richard David White, and deeming Baby Boy D., a/k/a R.D.W., eligible for adoption. Appeal is pursuant to Title 10, O.S.Supp. 1999, 7505–2.1(H)(2), which provides all appeals of cases concerning termination of pa-

rental rights under the Oklahoma Adoption Code shall be initiated by filing a petition in error in the Supreme Court within thirty days of the appealed order. Petitioner contests jurisdiction and argues due process violations, violations of the Interstate Compact on the Placement of Children (ICPC), the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), Parental Kidnaping Prevention Act (PKPA), fraud and that the trial court's order is against the clear weight of the evidence.

¶ 25 Chosen Child Agency, Inc. of Tulsa filed a Petition for Termination of Parental Rights on March 9, 1999. The biological mother completed the appropriate forms pursuant to 10 O.S.Supp.1999, 7503–2.3 and the trial court terminated her parental rights that same day pursuant to § 7503–2.3(L)(1), finding jurisdiction under the Oklahoma Adoption Code, 10 O.S.Supp.1999, 7501 et. seq. Temporary custody was given to the adoption agency pursuant to § 7503–4.1(B)(1). Notice by publication was given to the putative father on March 15, 1999, of a hearing to terminate his parental rights set on April 14, 1999. At the time, no paternity instrument was on file with the paternity registry.

¶ 26 The trial court declined jurisdiction over the adoption proceeding and deferred it to the more appropriate state of Idaho, where the adoptive parents reside. The trial court also issued an order allowing the child to leave Oklahoma for the purpose of interstate adoption and placing custody with the adoptive couple, pending ICPC approval of the sending and receiving states. This occurred on March 9, 1999.

¶ 27 On March 11, 1999, an amended application and notice (signed March 12) were filed naming Richard White as the alleged biological father, with the hearing still set on April 14, 1999. On March 17, 1999, Petitioner's attorney entered his appearance and filed an application for emergency temporary order requiring Baby to remain in Oklahoma pending a hearing on paternity and/or custody. Baby had been transferred to Idaho, pursuant to the previous order of March 9, 1999.

¶ 28 On May 7, 1999, Petitioner filed a Writ of Habeas Corpus which the trial court held in abeyance, pending the hearing of Agency concerning termination of parental rights. Baby and his adoptive parents were in Oklahoma on that date. On May 10, 1999, Petitioner filed a petition to establish paternity and for other relief. He also requested custody of Baby, child support from the biological mother, a transfer of the matter to the district courts of Missouri and a temporary order pending adjudication by the Missouri courts.

¶ 29 On May 13, 1999, the trial court again held Petitioner's writ in abeyance, allowed the adoptive parents to intervene and granted their motion for a continuance of the hearing. The trial court set the hearing regarding termination of Petitioner's parental rights for June 1 and 2, 1999. The hearing for termination of parental rights concluded on June 3, 1999, and the best interests hearing was set for late July, then reset for August 31, 1999.

¶ 30 Agency filed an amended petition for termination of parental rights on May 28, 1999, noting Petitioner had asserted paternity and was due notice of the proceedings. On June 1–3, 1999, the trial court held an evidentiary hearing regarding termination of parental rights. Both the biological mother and Petitioner testified at this hearing. The court stated findings of fact on June 7, 1999, and found clear and convincing evidence Petitioner had not properly exercised his parental rights. At the hearing on a Motion to Settle Journal Entry, July 26, 1999, the court modified its verbal findings and stated sufficient grounds existed to terminate Petitioner's parental rights but reserved its decision on this issue until the best interests hearing. Petitioner then presented his first amended petition for writ of habeas corpus.

¶ 31 On August 31, 1999, the trial court held its final evidentiary hearing on the best interests of the child. The prospective adoptive mother testified. Based upon the totality of the evidence at the conclusion of the hearing, the trial court concluded Petitioner's parental rights should be terminated and Baby declared eligible for adoption. The

court so ordered, pursuant to 10 O.S.Supp. 1999, 7505–4.2(C)(1) and § 7505–2.1(D)(2).

¶ 32 Petitioner filed a Petition in Error and on September 17, 1999, a Motion to Retain Appeal Before the Supreme Court. He then filed an amended Petition in Error on November 1, 1999. On January 7, 2000, Respondents/Appellees, Intervenors (adoptive parents), filed a motion to strike with this Court. On January 20, 2000, we deferred consideration of the motion to strike until a decision on the merits. The Court granted Petitioner's Motion to Retain on February 15, 2000.

### Motion to Strike

¶ 33 Respondents/Appellees, Intervenors, filed their motion to strike on the basis that Petitioner, in his brief-in-chief and reply brief to this Court, argued the substance of affidavits that were excluded from the record by the trial court. Petitioner failed to seek reconsideration of the trial court's evidentiary rulings which excluded these affidavits. Upon a review of the record, we agree that Petitioner indeed has argued the substance of these affidavits in his briefs before this Court. Further, the trial court explicitly excluded these affidavits from the record. As such, Petitioner's attempts to argue the substance of documents not properly a part of the record on appeal are improper. *See* Rule 1.28(b), Supreme Court Rules, which provides in pertinent part: "Materials which were not before the trial court at the time of the decision appealed are not properly part of the record on appeal, without order of the trial court or the appellate court." Petitioner attempted to circumvent this rule by attaching one such affidavit to his first amended petition for a writ of habeas corpus, then filing the petition before the trial court. This does not suffice to place that affidavit in the record on appeal, because the trial court excluded it from the proceedings as hearsay. In addition, we note that Petitioner's arguments with respect to the remaining two affidavits not properly a part of the record on appeal are (1) that the trial court should have admitted them and (2) that these affidavits relate to Petitioner's arguments of due process violations and subject matter jurisdic-

tion. These arguments ignore the spirit and the reality of Rule 1.28(b). Petitioner does not argue these affidavits are not hearsay. Nor does Petitioner argue that an exception to the hearsay rule applies to these affidavits. Therefore, we grant the Motion to Strike Petitioner's Arguments Regarding Documents Not Properly Part of the Record.

¶ 34 We note that the trial court's evidentiary ruling to preclude as hearsay the affidavits at issue, to-wit: affidavits of the biological mother and ICPC administrators in Missouri and Oklahoma, was proper under 12 O.S.Supp.1991, 2801 (Definitions of Hearsay) and 12 O.S.1978, 2802 (Hearsay Rule). The biological mother testified during the proceedings and the ICPC administrators were available to testify had the trial court determined their testimony relevant. The trial court's ruling was well within the bounds of its discretion, as the affidavits were inadmissible hearsay and no exception to the hearsay rule was applicable to them. *Elledge v. Staring*, 1996 OK CIV APP 161, ¶¶ 7–8, 939 P.2d 1163, 1165 (reh'g.denied)(cert.denied) (wherein the court held an affidavit offered to establish an evidentiary link regarding an issue of fact was inadmissible hearsay, speculative rather than factual, and irrelevant).

### Standard of Review

¶ 35 The standard of review for a trial court's conclusion regarding a child's eligibility for adoption without the consent of the biological parent is whether it is supported by the clear weight of the requisite clear and convincing evidence. *Matter of Adoption of R.W.S.*, 1997 OK 148, ¶ 10, 951 P.2d 83, 86 (reh'g.denied); *Matter of Adoption of J.L.H.*, 1987 OK 25, ¶ 12, 737 P.2d 915, 918. The Oklahoma Adoption Code provides in § 7505–4.2(C)(1) and (2) as follows:

"C. Consent to adoption is not required from a father or putative father of a minor born out of wedlock if:

1. The minor is placed for adoption within 90 days of birth, and the father or putative father fails to show he has exercised parental rights or duties towards the minor, including, but not limited to, failure to contribute to the support of the mother of

the child to the extent of his financial ability during her term of pregnancy.... "

■ ¶ 36 Petitioner failed to show he exercised parental rights or duties toward Baby under § 7505–4.2(C)(1). Although the veracity of the parties' testimony before the trial judge was called into question and conflicting testimony abounded, we are confident in the advantage given the trial judge to determine witnesses' credibility.

"The trial judge, by being confronted with the parties and the witnesses, was in a much better position to assess the credibility of those witnesses than is this Court from 'the dry, printed words in the record.' Perry v. Perry, 1965 OK 160, ¶ 5, 408 P.2d 285, 287."

In re H.M., 1998 OK CIV APP 176, ¶ 12, 970 P.2d 1190, 1192–1193.

■ ¶ 37 Petitioner argues the trial court's termination of his parental rights was against the weight of clear and convincing evidence. We disagree. Petitioner had every opportunity to assert his parental rights but failed to do so. We have set forth previously the circumstances in which unwed fathers fail to grasp parental opportunities and Petitioner's circumstances are disturbingly consistent with our prior determinations. See, e.g., Matter of C.J.S., 1995 OK 70, 903 P.2d 304 (wherein unwed biological father did not live with mother and was not married to her; failed to list himself on birth certificates as father; failed to contribute to the children's needs or to mother's needs; failed to hold himself out as father at time termination proceedings were initiated; failed to file with paternity registry); In the Matter of the Adoption of Baby Boy D., 1985 OK 93, 742 P.2d 1059 (cert. denied by Harjo v. Duello, 484 U.S. 1072, 108 S.Ct. 1042, 98 L.Ed.2d 1005(U.S.Okla.1988))(wherein unwed biological father failed to provide for mother during pregnancy; failed to offer to marry mother; made no attempt to learn when and where child was to be born; never told his family she was pregnant; failed to pay expenses related to birth; had no contact with child after birth; never told mother he wanted child until when his suit was filed); In the Matter of the Adoption of Baby Girl M., 1997 OK CIV APP 33, 942 P.2d 235 (reh'g.denied)(cert.denied)(wherein unwed biological father failed to support mother during pregnancy; failed to acknowledge paternity or take legal action to establish same prior to birth or immediately after, although he believed child to be his; made no inquiries regarding mother's medical bills and failed to assist in payment thereof; failed to contribute to mother's living expenses during pregnancy; failed to support baby after birth). The record establishes that clear and convincing evidence exists to support the trial court's decision to terminate Petitioner's parental rights and the order of the trial court also is consistent with our previous decisions on this issue.

## Subject Matter Jurisdiction

■ ¶ 38 The case at bar is a pre-adoption proceeding to terminate parental rights and is ancillary to an adoption proceeding under the Oklahoma Adoption Code. The trial court deferred jurisdiction over the adoption proceeding in this matter to the Idaho courts, because the adoptive parents reside in the state of Idaho. We previously held, "The UCCJA is the exclusive method in Oklahoma to determine subject matter jurisdiction in all custody proceedings." In Interest of L.S., 1997 OK 109, ¶ 6, 943 P.2d 621, 622. We also determined therein that adoption was an ultimate custody determination and that a "custody proceeding" as defined by the UCCJEA encompassed adoption actions. 1997 OK 109 at ¶ 15, 943 P.2d at 624. This decision was handed down prior to the 1998 amendments to the UCCJEA and the Oklahoma Adoption Code. To the extent that In Interest of L.S., 1997 OK 109, 943 P.2d 621, held that a "custody proceeding" as defined by the UCCJEA encompassed adoption actions, it was legislatively overruled by the 1998 amendments to the UCCJEA. 43 O.S.Supp.1999, 551–103 now specifically provides that the UCCJEA does not apply to adoption actions.

¶ 39 Petitioner argues the trial court lacked subject matter jurisdiction because the biological mother, Petitioner and Baby had no significant contacts with Oklahoma and further argues the UCCJEA, ICPC and PKPA were violated. However, once the biological mother relinquished her parental

rights, Baby effectively was abandoned and the trial court appropriately assumed emergency jurisdiction under the Oklahoma Adoption Code, codified at 10 O.S.Supp.1999, 7501–1.1 *et seq.* Prior to the 1998 amendments, emergency jurisdiction also would have been proper under the temporary emergency jurisdiction provision contained in the Oklahoma Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), 43 O.S.Supp.1999, 551–204. However, in view of these amendments, we determine subject matter jurisdiction solely under the emergency jurisdiction provision applicable to cases of abandonment contained in § 7502–1.1(A)(4) of the Oklahoma Adoption Code. Section 7502–1.1(A)(4) provides for jurisdiction over proceedings to terminate parental rights if:

"The minor and the prospective adoptive parent are physically present in this state, and the minor has been abandoned or it is necessary in an emergency to protect the minor because the minor has been subjected to or threatened with mistreatment or abuse or is otherwise neglected.... "

¶ 40 We adopt the definition of "abandoned" contained in the UCCJEA for purposes of the Oklahoma Adoption Code since the latter does not define the term in its definitions section that is contained in § 7501–1.3. "Abandoned" as defined in the UCCJEA, "means left without provision for reasonable and necessary care or supervision." 43 O.S.Supp.1999, 551–102(1). When the biological mother relinquished her parental rights and returned to Missouri on March 9, 1999, she abandoned Baby in Oklahoma and the trial court properly exercised jurisdiction under the above-cited emergency jurisdiction provision contained in the Oklahoma Adoption Code.

### Due Process

¶ 41 The Fourteenth Amendment provides no state shall deprive any person of life, liberty or property without due process of law. U.S. Const. amend. XIV, § 1. Petitioner's legal analysis fails to differentiate between procedural and substantive due process or to reference either with regard to the assertion his due process rights were violated. He also fails to invoke the provision of the Oklahoma Constitution that triggers his liberty interest, to-wit: Article 2 § 7, which provides, "No person shall be deprived of life, liberty, or property, without due process of law."

"The Constitution protects only parent-child relationships of biological parents who have actually committed themselves to their children and have exercised responsibility for rearing their children. This principal has its basis in the theory that the process of defining which relationships are constitutionally significant includes a consideration of how the competing interests are served by protection. Parents who commit themselves to their children and take responsibility for rearing their children share the state's interest in assuming proper care for their children.... However, the paramount interest to be considered is the child's best interest."

*Matter of Adoption of Baby Boy D.,* 1985 OK 93, ¶¶ 45–46, 742 P.2d 1059, 1067.

¶ 42 It is difficult to imagine why Petitioner complains his right to due process was violated in view of the fact that Petitioner received actual notice of the proceedings in this matter as required by statute, in addition to the initial notice by publication, and Petitioner and his witnesses testified at great length before the trial court not only during the hearing on Agency's amended petition to terminate parental rights, but also at the best interests hearing. Therefore, Petitioner clearly received notice and the opportunity to be heard.

¶ 43 We recognize Petitioner's liberty interest in parenting Baby, but he wholly failed to grasp even one of the many opportunities he had to establish that parental relationship. Petitioner fell far short of committing himself to Baby and of taking responsibility for rearing Baby. His relationships with his other children also lack permanence and stability. "The basis for constitutional protection is missing if the parent seeking it has not taken on those parental responsibilities which provide such permanence and stability." *Matter of Adoption of Baby Boy D.,* 1985 OK 93, ¶ 47, 742 P.2d 1059, 1068. As such, we must consider whether the trial court appropriately balanced the paramount interest of the

state in securing the best environment possible for Baby with Petitioner's liberty interest in rearing him. The record establishes the existence of clear and convincing evidence from which the trial court concluded that Petitioner failed to grasp his opportunities to parent Baby and failed to assume his parental responsibilities with regard to Baby.

### 42 U.S.C. Sections 1983 and 1981

¶ 44 Petitioner claims that Agency's actions somehow constituted state action or were under color of state law and violated his civil rights. However, he cites no legal authority that actions of a private adoption agency licensed by the state constitute "state action" within the meaning of 42 U.S.C. § 1981 or 42 U.S.C. § 1983. Indeed, we know of none. The trial court went to great lengths to balance Petitioner's liberty interest with the best interests of Baby. Further, no state action within the meaning of these federal statutes occurred.

### Interstate Compact on the Placement of Children

¶ 45 Petitioner asserts the Interstate Compact on the Placement of Children, codified at 25 O.S.Supp.1991, 571 et seq., governs subject matter jurisdiction and negates the trial court's action. The ICPC does not negate subject matter jurisdiction under the Oklahoma Adoption Code and Petitioner does not cite any legal authority that so holds. In the case at bar, the biological mother brought Baby to Oklahoma and relinquished her parental rights, then left the state and abandoned Baby. The trial court assumed emergency jurisdiction and placed Baby with Agency, which clearly was in Baby's best interest. Agency sent Baby to Idaho, following the trial court's order that released him for adoption in another state and pending ICPC approval.

¶ 46 We recognize that the biological mother failed to obtain ICPC approval prior to the time she brought Baby to Oklahoma and relinquished her parental rights. However, retroactive compliance with ICPC provisions suffices to uphold court orders issued prior to compliance. Indeed, the state of Missouri, which Petitioner argues should have jurisdiction, has held that revoking consent due to noncompliance with the ICPC, "could produce a potentially harsh result that may be contrary to the child's best interests." *In re Baby Girl*, 850 S.W.2d 64, 71 (Mo.1993).

¶ 47 The purpose of the ICPC is to promote interstate placement of children and to provide each child, " ... the maximum opportunity to be placed in a suitable environment.... " 25 O.S.Supp.1991, 571, Article I(a). In the instant case, the essential requirements of a sound adoption were met. The biological mother gave her irrevocable consent before the trial court and filed no document in which she purported to revoke that consent. To the contrary, she testified at the final evidentiary hearing that she wanted the adoption to take place and that she believed it was in Baby's best interests to be adopted by Does/Intervenors. The adoptive parents agreed to adopt Baby and were found to be exemplary parents. Petitioner's parental rights were terminated. Therefore, only the failure to comply with the Compact when the biological mother brought Baby to Oklahoma would stand in the way of a final order of adoption by the Idaho adoption court.

¶ 48 Our paramount duty is to protect Baby's best interests, and for us to hold that the trial court's order is void for failure to comply with the ICPC at one juncture would not be in Baby's best interests. Such a holding would be an unusually harsh result and would punish Baby, an innocent party. If the state of Oklahoma or the state of Missouri initially had received an opportunity to evaluate the planned interstate placement of Baby with the prospective adoptive parents (Does/Intervenors) prior to the biological mother's journey with Baby to Oklahoma, it is clear to us Compact officials would have determined Does/Intervenors would afford Baby a "suitable environment" in their secure, loving home. Thus, the Compact's ultimate goal was achieved. Retroactive compliance with the ICPC is possible and best serves Baby's interests.

### Parental Kidnaping Protection Act

¶ 49 The federal Parental Kidnaping Protection Act of 1980 (PKPA), codified at 28 U.S.C. § 1738A, is inapplicable to the instant case. The express purpose of the Act is, "to provide for nationwide enforcement of custo-

dy orders made in accordance with the terms of the UCCJA." *Matter of Henry,* 326 Or. 166, 169–170, 951 P.2d 135, 137 (1997)(quoting *Thompson v. Thompson,* 484 U.S. 174, 108 S.Ct. 513, 98 L.Ed.2d 512, 56 USLW 4055 (1988)). The PKPA forces states to give full faith and credit to the custody decrees of sister states and no custody decree of a sister state exists in the case at bar.

### Fraud

██ ¶ 50 Petitioner argues the biological mother perpetrated a fraud upon the trial court and that as a result, all court orders are tainted and must be reversed. The biological mother testified when she relinquished her parental rights to Baby that she did not know the identity of Baby's father. Subsequently, Mother told Agency the identity of Baby's biological father. Agency notified the trial court and filed an amended notice and an amended petition for termination of parental rights which reflected the identity of Petitioner. As a result, Petitioner received actual notice as well as publication notice of the proceedings of the trial court in this matter and also was given the opportunity to appear and be heard. Petitioner and his witnesses testified at great length before the trial court at the hearing on Agency's Petition to Terminate Parental Rights and at the best interests hearing.

¶ 51 We consistently have held that, "In order to secure relief on the basis of fraud, the person seeking redress must have been damaged. Fraud, without injury, is not actionable at law or in equity." *Bridges v. Bridges,* 1975 OK 170, ¶ 6, 544 P.2d 493, 494. *See also, Hollis v. Hollis,* 197 Okla. 524, 527, 172 P.2d 999, 1002. The trial court discovered and rectified the biological mother's perjured testimony and fraud. As such, it did not injure Petitioner and therefore is not actionable.

¶ 52 The trial court properly exercised jurisdiction over the instant case under the emergency jurisdiction provision of the Oklahoma Adoption Code. The trial court's decision to terminate Petitioner's parental rights based upon the best interests of Baby is supported by clear and convincing evidence.

Petitioner's right to due process was not violated, nor were his civil rights. Any fraud which occurred was harmless because the trial court recognized and cured it. Additional issues, if any, are moot in view of these findings.

¶ 53 Petitioner failed to exercise his opportunities to assume parental responsibilities and it is in Baby's best interests to terminate Petitioner's rights and allow the adoption to proceed. The order of the trial court which terminated Petitioner's parental rights and declared Baby eligible for adoption is affirmed.

### AFFIRMED.

¶ 54 HARGRAVE, V.C.J., HODGES, KAUGER, WATT, and WINCHESTER, JJ., concur.

¶ 55 Opala, J., Concurs in result.

¶ 56 SUMMERS, C.J., LAVENDER, and BOUDREAU, JJ., Dissent.

BOUDREAU, J., with whom SUMMERS, C.J., joins, dissenting:

¶ 1 I respectfully dissent. I do not view Oklahoma as having any basis under the Oklahoma Adoption Code, 10 O.S.Supp.1999, 7501–1.1 et seq., upon which to exercise subject matter jurisdiction over a proceeding to terminate Father's parental rights.

¶ 2 One of the three indispensable jurisdictional prerequisites of a valid judgment is subject matter jurisdiction.[1] *Reed v. Scott,* 1991 OK 113, 820 P.2d 445. The question of whether a court has subject matter jurisdiction over a legal controversy presents a question of law. Questions of law are reviewed *de novo. Neil Acquisition, L.L.C. v. Wingrod Investment Corporation,* 1996 OK 125, 932 P.2d 1100.

¶ 3 The facts relating to the question of subject matter jurisdiction are few and uncontested. Baby Boy D was born in Kansas. Biological mother and father reside in Missouri. Prospective adoptive parents reside in Idaho. Placement agency does business in Tulsa, Oklahoma.

¶ 4 Section 7502–1.1 of the Adoption Code establishes five alternative bases upon which

---

1. The other two jurisdictional prerequisites are jurisdiction over the parties and the jurisdiction-al power to pronounce the particular decision that was entered.

an Oklahoma court may exercise subject matter jurisdiction over adoption proceedings and over termination of parental rights proceedings initiated under the Adoption Code.[2] Derived from the 1994 Uniform Adoption Act approved by the National Conference of Commissioners on Uniform State Laws, these bases clearly favor jurisdiction in the State with the most substantial evidence about the prospective adoptive family.[3] In the case in controversy, this jurisdiction is clearly the state of Idaho. The trial court recognized this when, after terminating Father's parental rights, it transferred the adoption to Idaho.

## I.

**The expansive manner in which the majority opinion applies the concept of emergency jurisdiction undermines the subject matter jurisdictional requirements for adoption and termination proceedings set forth in the Oklahoma Adoption Code.**

¶ 5 Seeking a basis upon which the trial court might exercise subject matter jurisdic-

tion over the proceeding to terminate Father's parental rights, the majority opinion concludes that the Oklahoma court correctly assumed emergency jurisdiction under the Adoption Code. The basis for emergency jurisdiction can be found at § 7502–1.1(A)(4) of the Code and permits the exercise of jurisdiction if both:

> the minor and the prospective adoptive parent are physically present in this state, and the child has been abandoned or it is necessary in an emergency to protect minor because the minor has been subjected to or threatened with mistreatment or abuse or is otherwise neglected;

The emergency provision of the Adoption Code is clearly designed to allow a court to assume jurisdiction when a child with no significant connection to the state is abandoned or endangered in Oklahoma.

¶ 6 The emergency jurisdiction provision in the Adoption Code does not provide a basis for Oklahoma to assume jurisdiction over the proceeding to terminate Father's parental

**2.** The five bases for jurisdiction are set out in 10 O.S.Supp.1999, 7502–1.1(A), which provides:

> A. Except as otherwise provided in this section, a court of this state has jurisdiction over proceedings to terminate parental rights and proceedings for the adoption of a minor commenced pursuant to the Oklahoma Adoption Code if:
> 1. a. Immediately preceding commencement of the proceeding, the minor lived in this state with a parent, a guardian, a prospective adoptive parent, or another person acting as parent, for at least six (6) consecutive months, excluding periods of temporary absence,
> b. In the case of a minor under six (6) months of age, the minor lived in this state from soon after birth with any of those individuals listed in subparagraph a of this paragraph and there is available in this state substantial evidence concerning the minor's present or future care, or
> c. A child is born in this state and the mother of the child executes her consent or permanent relinquishment before a judge of a court of this state;
> 2. Immediately preceding commencement of the proceeding, the prospective adoptive parent lived in this state for at least six (6) consecutive months, excluding periods of temporary absence, and there is available in this state substantial evidence concerning the minor's present or future care;

> 3. The child-placing agency that placed the minor for adoption is located in this state and it is in the best interest of the minor that a court of this state, assume jurisdiction because:
> a. the minor and the minor's parents, or the minor and the prospective adoptive parent, have a significant connection with this state, and
> b. there is available in this state substantial evidence concerning the minor's present or future care;
> 4. The minor and the prospective adoptive parent are physically present in this state, and the minor has been abandoned or it is necessary in an emergency to protect the minor because the minor has been subjected to or threatened with mistreatment or abuse or is otherwise neglected; or
> 5. It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs 1 through 4 of this subsection, or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to hear a petition for adoption of the minor, and it is in the best interest of the minor that a court of this state assume jurisdiction.

**3.** Joan Heifetz Hollinger, *The Uniform Adoption Act: Reporter's Ruminations*, 30 Fam.L.Q., 345, 369 (Summer 1996). 10 O.S.Supp.1999, 7502–1.1, Oklahoma Comments.

rights. First, Birth Mother appeared in the Tulsa County District Court on March 9, 1999, and allowed the court to terminate her parental rights. On the same day, the court granted temporary custody to the adoption agency. The record on appeal does not establish that the prospective adoptive parent were physically present in Oklahoma when the child-placing agency assumed custody of the child.[4] Without the prospective adoptive parents physically present in the state at the time the custody order was issued, the trial court had no basis to assume emergency jurisdiction.[5]

¶ 7 Second, no true emergency exists. When a child is placed for adoption through a child-placing agency, an abandonment or emergency due to the child's pre-placement circumstances has been resolved by the placement itself. A child placed with a child-placing agency is not a child "left without provision for reasonable and necessary care or supervision."

¶ 8 Finally, if the notion of emergency jurisdiction is applied in a such an expansive manner, it will effectively eviscerate any subject matter jurisdictional requirements for adoption and termination proceedings. The mere placing of a child with an adoption agency in Oklahoma becomes sufficient to vest our courts with jurisdiction over the adoption, even though Oklahoma has no connections to the child or the prospective adoptive parents. A birth mother from any state in the nation may now travel to Oklahoma with prospective adoptive parents and place a child with an agency for adoption in Oklahoma. Because she is deemed to have abandoned her child, the courts of this state may assume emergency jurisdiction and then proceed to terminate the parental rights of the father no matter how attenuated or nonexistent his connection with this state.[6]

¶ 9 The concept of emergency jurisdiction should be narrowly construed. In referring to the "emergency jurisdiction" provision under the former Uniform Child Custody Jurisdiction Act,[7] this Court has stressed that the provision is "reserved for extraordinary circumstances," and "it must not be misused to defeat the purposes of the act, ... " *Holt v. District Court*, 1981 OK 39, 626 P.2d 1336, 1345.[8] As applied by the Court in this case, the emergency jurisdiction provision undermines the policy of the Oklahoma Adoption Code which favors adoption jurisdiction in the state with the most substantial evidence about the prospective adoptive family. By defining emergency jurisdiction so expansively, the court tears a large hole in the act and opens the possibility that Oklahoma will become an adoption mill for out of state adopters with little or no connection to this state who may wish to invoke favorable Oklahoma law regarding termination of parental rights or adoption.

## II.

## Oklahoma does not have jurisdiction over Father under the 1998 amendments which extended the subject matter jurisdiction of the Oklahoma courts under the Adoption Code.

¶ 10 In 1998, the legislature extended the subject matter jurisdiction of the Oklahoma courts beyond the limitations established by the five original bases set out in § 7502–1.1(A). Under § 7502–1.1(B)(1), Oklahoma courts are now permitted to adjudicate a proceeding to terminate the parental rights

---

4. The record does reflect that the adoptive parents appeared before the Tulsa County court on May 7, 1999, at a hearing on the petition for habeas corpus filed by natural Father.

5. In its order granting custody to the child-placing agency, the trial court made no claim to be assuming emergency jurisdiction.

6. Similarly, the courts of this state may also proceed with the adoption even though no evidence about the child or about the prospective adoptive family can be found here.

7. 43 O.S.1991, 501, et seq., repealed by 1998 O.S.L., ch. 407, § 43, within the enactment of the Uniform Child Custody Jurisdiction and Enforcement Act, 43 O.S.Supp.1999, 551–101, et seq.

8. The five alternative bases upon which Oklahoma courts may exercise subject matter jurisdiction over proceedings to terminate parental rights and adoption proceedings are similar to the bases established by the UCCJA, with modifications that respond to the unique circumstances of adoption proceedings.

of a putative father, initiated prior to the commencement of an adoption proceeding pursuant to 10 O.S.Supp.1998, 7505–2.1, even when none of the above five bases are satisfied, if two requirements are met:

(1) the child is born in Oklahoma; and

(2) the birth mother has executed her consent or permanent relinquishment before a judge in Oklahoma.

However, Oklahoma courts that are permitted to hear preadoption termination proceedings under this section are prohibited from exercising jurisdiction over the adoption proceeding itself. 10 O.S.Supp.1999, 7502–1.1(B)(4).

¶ 11 Oklahoma's contacts with Father do not even meet the requirements set forth in the 1998 amendments that extend the subject matter jurisdiction of Oklahoma courts to hear preadoption termination proceedings. Although Birth Mother executed her consent or relinquishment within the state, the child was born in Kansas, not Oklahoma.

### III.

### Conclusion

¶ 12 I would vacate the order terminating Father's parental rights for lack of subject matter jurisdiction. The petition to terminate Father's parental rights can proceed in Idaho, the state with jurisdiction over this adoption. While the stability of the adoptee and the preservation of any bond created with the prospective adoptive parents are extremely important considerations, Oklahoma's contacts with one whose parental rights are being terminated must be such that the application of its law is neither fundamentally unfair or arbitrary. The termination proceeding in this case did not meet this standard.