OSCN Found Document:IN RE: N.A.; STATE OF OKLAHOMA vs MALDONADO et al

Previous Case

Top Of Index

This Point in Index

Citationize

Next Case

Print Only

IN RE: N.A.; STATE OF OKLAHOMA vs MALDONADO et al2025 OK 22Case Number: 122331 (cons w/ 122399)Decided: 04/08/2025THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2025 OK 22, __ P.3d __

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

IN RE: N.A., a/k/a M.N.A.M., and L.A., adjudicated deprived children.
STATE OF OKLAHOMA, Petitioner/Appellee,
v.
CYNTHIA MALDONADO and MARTHA AMARO, Respondents/Appellants.

ON APPEAL FROM THE DISTRICT COURT OF TEXAS COUNTY, STATE OF OKLAHOMA
HONORABLE CHRISTINE MARIE LARSON, ASSOCIATE DISTRICT JUDGE

¶0 This appeal concerns whether an Oklahoma district court has jurisdiction over a juvenile deprived proceeding pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), 43 O.S.2024, §§ 551-101

ORDER OF DISTRICT COURT IS AFFIRMED.

Evan Humphreys, Guymon, Oklahoma, for Appellant Cynthia Maldonado.

Avery Haines, Dale & Haines, Guymon, Oklahoma, for Appellant Martha Amaro.

Christopher J. Liebman, Guymon, Oklahoma, for Appellees the Children.

KANE, J.:

¶1 This case involves a family that lived on both sides of the Oklahoma-Kansas border and in Mexico. Respondents/Appellants Cynthia Maldonado and Martha Amaro appeal from the trial court's order determining that, pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), 43 O.S.2024, §§ 551-101

FACTS AND PROCEDURAL HISTORY

¶2 Maldonado is the biological mother of L.A. (born May 2022) and N.A. (born March 2024), also known as M.A., M.A.M., and M.N.A.M. Amaro is Maldonado's wife and listed as the second parent on the Children's birth certificates.

¶3 Maldonado gave birth to N.A. on March 19, 2024 at Southwest Medical Center in Liberal, Kansas. Maldonado and N.A. tested positive for methamphetamine at the time of birth. The Texas County District Court of Oklahoma ordered that N.A. and L.A. be taken into emergency custody by the Oklahoma Department of Human Services (OKDHS) on March 21, 2024. The older sibling L.A. was located with a babysitter in Liberal, Kansas. The children were placed in foster care in Oklahoma, and the State of Oklahoma petitioned to adjudicate the children deprived as to both Maldonado and Amaro.

¶4 On June 4, 2024, Maldonado filed a Motion to Determine Subject Matter Jurisdiction with Brief in Support. Maldonado argued the Oklahoma district court did not have jurisdiction to make an initial child custody determination. She argued that, according to the UCCJEA, Oklahoma is not the home state of L.A. or N.A. Maldonado contended that Mexico was L.A.'s home state and Kansas was N.A.'s home state. Maldonado further argued that Oklahoma did not have temporary emergency jurisdiction under the UCCJEA, because the Children were not present in the state of Oklahoma when the district court ordered the Children be taken into emergency custody.

¶5 The State responded that the Oklahoma Children's Code, 10A O.S.2024, § 1-4-101

¶6 After hearing testimony from several witnesses, the trial court found that L.A. had lived in Oklahoma for six months preceding the commencement of the deprived proceeding, which made Oklahoma the child's home state and gave the Oklahoma district court jurisdiction under the UCCJEA. The trial court adjudicated the Children deprived as to both parents on June 27, 2024. Parents appealed both the order finding the court had jurisdiction under the UCCJEA and the adjudication order. The appeals were retained and consolidated by this Court. Amaro's appeal has been dismissed.

STANDARD OF REVIEW

¶7 When there are no contested jurisdictional facts, whether the trial court properly exercised jurisdiction under the UCCJEA is purely a question of law, which the appellate court reviews de novo. See Rader v. Rader, 2020 OK 106478 P.3d 438 I. T. K. v. Mounds Pub. Sch., 2019 OK 59451 P.3d 125See In re Guardianship of K.D.B., 2025 OK 10564 P.3d 83I. T. K., 2019 OK 59de novo, as it presents a question of law.

¶8 Additional questions of law presented in this appeal are also reviewed de novo. See In re V.J.R., 2024 OK 66556 P.3d 1010de novo standard, this Court examines legal issues independently, without deference to the trial court's findings." Id.

¶9 As to the adjudication order, the State must support the allegations in a petition seeking the adjudication of a child as deprived by a preponderance of the evidence. See 10A O.S.2024, §§ 1-4-602In re J.D.H., 2006 OK 5130 P.3d 245

ANALYSIS

I. Mootness

¶10 On January 16, 2025--while Parents' appeals from the adjudication order were pending--the trial court entered a Final Permanency Order (Exit Order) returning the Children to Parents. The trial court dismissed the underlying juvenile proceeding based on the recommendations of the Department of Human Services and the District Attorney.

¶11 We find the appeal is not moot based on the collateral consequences doctrine. "It is a long-established rule that this Court will not consume its time by deciding abstract propositions of law or moot issues." Baby F. v. Okla. Cty. Dist. Court, 2015 OK 24348 P.3d 1080See In re I.T.S., 2021 OK 38490 P.3d 127I.T.S., the mother appealed the termination of her parental rights as to three children. Id. ¶¶ 1, 8, at 129-130. Two of the children reached the age of emancipation while the appeal was pending and the third child was approaching the age of emancipation at the time this Court issued an opinion. Id. ¶ 24, at 134. Nonetheless, this Court found the case was not moot because the mother faced ongoing collateral consequences as a result of having her parental rights terminated. Id. ¶ 25, at 134 (citing 10A O.S.2024, § 1-4-90410A O.S., § 1-4-904I.T.S. was that, under the law, having parental rights terminated as to one child may be grounds for termination of rights to other children in the future.

¶12 In this case, the Children were adjudicated deprived; parental rights were not terminated. However, a comparable legal disability flows from an adjudication order. Title 10A, § 1-4-904(B)(14) provides:

B. The court may terminate the rights of a parent to a child based upon the following legal grounds:

. . .

14. A finding that:

a. the condition that led to the deprived adjudication has been the subject of a previous deprived adjudication of this child or a sibling of this child, and

b. the parent has been given an opportunity to correct the conditions which led to the determination of the initial deprived child.

10A O.S., § 1-4-904

II. Subject Matter Jurisdiction

¶13 Maldonado argues the Oklahoma district court did not have subject matter jurisdiction under the UCCJEA. The State, at trial,

¶14 As an initial matter, it is pertinent we clarify a few principles of jurisdiction and the UCCJEA and OCC's roles with respect to those principles. Personal jurisdiction is the requirement that the court has power over the parties. See Conoco, Inc. v. Agrico Chem. Co., 2004 OK 83115 P.3d 829In personam jurisdiction is the power to deal with the person of the defendant and to render a binding judgment against the defendant."). Personal jurisdiction is acquired by service of process or by voluntarily appearing before the court. Id. The parties may consent to or waive the personal jurisdiction requirement. See 12 O.S.2024, § 2012Powers v. Dist. Court of Tulsa Cty., 2009 OK 91227 P.3d 1060See State ex rel. Okla. Bar Ass'n v. Mothershed, 2011 OK 84264 P.3d 1197

Upon the filing of a petition, the assumption of the custody of a child, or issuance of an emergency custody order pursuant to the provisions of the Oklahoma Children's Code, the district court shall obtain jurisdiction over any child who is or is alleged to be deprived. Jurisdiction shall also be obtained over any parent, legal guardian, or custodian of and any other person living in the home of such child who appears in court or has been properly served with a summons pursuant to Section 1-4-304 of this title.

10A O.S., § 1-4-101see In re H.M.A., 2025 OK CIV APP 210A O.S., § 1-4-101

¶15 Subject matter jurisdiction is the requirement that the court has the power to adjudicate the type of controversy. See In re A.N.O., 2004 OK 3391 P.3d 646See Okla. Const. art. 7, § 7; Jernigan v. Jernigan, 2006 OK 22138 P.3d 539unlimited original jurisdiction of all justiciable matters, except as otherwise provided in this Article . . . ." Okla. Const. art. 7, § 7 (emphasis added). Oklahoma district courts are courts of general jurisdiction, meaning they have the power to adjudicate nearly every type of controversy, civil and criminal, that arises within the State's territorial boundaries. See A.N.O., 2004 OK 33by the Oklahoma Constitution includes the power and authority to adjudicate these types of controversies. The Oklahoma district court had subject matter jurisdiction over this proceeding.

¶16 Therefore, we reject the Children's argument that the OCC determines whether an Oklahoma district court has subject matter jurisdiction over a juvenile deprived proceeding. But we also reject Maldonado's argument--and the trial court's determination--that the UCCJEA determines subject matter jurisdiction. Whether an Oklahoma district court has subject matter jurisdiction over a juvenile deprived proceeding is determined by the Oklahoma Constitution, not the UCCJEA.

¶17 If jurisdiction under the UCCJEA is not subject matter jurisdiction, then what is it? Two or more courts may have jurisdiction over the same type of controversy or subject matter. This is referred to as concurrent jurisdiction. For example, the Oklahoma district court may share concurrent jurisdiction with another state, federal, or tribal court. When two courts share concurrent jurisdiction, either court could exercise jurisdiction. However, there may be statutory, procedural limitations that determine which court should exercise jurisdiction or which court has priority to exercise jurisdiction. That is precisely what the UCCJEA is intended to do. See In re Teagan K.-O., 242 A.3d 59, 78-83 (Conn. 2020) (holding the UCCJEA does not confer subject matter jurisdiction on the courts but instead determines which state is permitted to exercise its existing subject matter jurisdiction when there is concurrent jurisdiction). Among its stated purposes, the UCCJEA is intended to avoid jurisdictional competition and conflict with courts of other states, promote cooperation with the courts of other states, and avoid relitigation of custody decisions of other states. See 43 O.S., § 551-10143 O.S., § 551-207See Teagan K.-O., 242 A.3d at 81 ("The fact that the UCCJEA resolves competing claims of jurisdiction and does not itself create jurisdiction is most clearly manifested in its inconvenient forum provision, which allows a court having jurisdiction to decline to exercise jurisdiction in favor of another state's court.").

¶18 Admittedly, in the past this Court has casually referred to UCCJEA jurisdiction as "subject matter jurisdiction." See, e.g., Rader, 2020 OK 106de novo."); White v. Adoption of Baby Boy D., 2000 OK 4410 P.3d 212In Interest of L.S., 1997 OK 109943 P.2d 621Joliff v. Joliff, 1992 OK 38829 P.2d 34 H.M.A., 2025 OK CIV APP 2see also Jones v. White, 2018 OK CIV APP 68430 P.3d 544

¶19 Lastly, the State and the Children's argument that the UCCJEA does not apply to juvenile deprived proceedings is without merit. The UCCJEA applies to child custody proceedings, meaning "a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue." 43 O.S., § 551-102Id. A juvenile deprived proceeding is a dependency proceeding in which legal custody, physical custody, and visitation with respect to a child is at issue. The UCCJEA applies to juvenile deprived proceedings.

III. L.A.'s Home State

¶20 We now turn to Maldonado's first proposition of error: whether, according to the UCCJEA, the Oklahoma district court properly exercised jurisdiction over L.A. See 43 O.S., § 551-201

"Home state" means the state in which a child lived with a parent or a person acting as a parent for at least six (6) consecutive months immediately before the commencement of a child custody proceeding. . . . A period of temporary absence of the parent or person acting as a parent is part of the period.

43 O.S., § 551-102See 43 O.S., § 551-105

¶21 On appeal, Maldonado asserts that L.A.'s home state is Mexico. It is undisputed that L.A. was born in California in May 2022 and then lived in Mexico with both Parents until Maldonado and L.A. moved back to the United States, at which point, Amaro continued to reside in Mexico.

¶22 There was conflicting evidence presented at the adjudication hearing as to when Maldonado and L.A. began residing in Oklahoma. Maldonado contends that Oklahoma was not established as L.A.'s new home state, because she had not yet lived in Oklahoma for six months prior to the commencement of the deprived proceeding. Maldonado argues that L.A. lived in Mexico for approximately one-and-a-half years with both parents, which clearly established Mexico as the child's home state, and Maldonado and L.A. did not begin living in Tyrone, Oklahoma, until October 2023, which was only five months prior to the commencement of the deprived proceeding.

¶23 The trial court found L.A. had lived in Oklahoma for six months preceding the commencement of the deprived proceeding. The parties agree that as of October 2023 Maldonado and L.A. were living in Tyrone, Oklahoma. The critical inquiry is whether the trial court's finding that L.A. resided in Oklahoma as of September 21, 2023 was clearly erroneous.

¶24 Christy Pharo's testimony supports the finding that L.A. lived in Oklahoma as of September 21, 2023. Pharo was Maldonado's friend and L.A.'s babysitter. She testified that Maldonado "came back" in June 2023.

¶25 Maldonado did not testify at the hearing, and she refused to complete the UCCJEA affidavit filed in the trial court on March 22, 2024. However, Tyrone Police Chief Carl Robertson's testimony that Maldonado had utilities reconnected at the trailer in Tyrone in October 2023 supports a finding Maldonado did not live in Oklahoma until October 2023. Additionally, Martha Amaro testified that Maldonado did not move to Tyrone until December 2023. Amaro testified that Maldonado and L.A. returned to the United States sometime between June 2023 and August 2023. Maldonado and L.A. initially lived in a hotel in Liberal, Kansas, for a few weeks and then with a friend in Liberal. Amaro testified that Maldonado and L.A. continued to live in Liberal, Kansas, until December 2023, when Maldonado told Amaro that she was pregnant and that she and L.A. would be moving to her trailer in Tyrone, Oklahoma. Amaro testified that when Maldonado made this announcement in December 2023 she was still living with a friend in Liberal. Amaro explained that she knew where Maldonado and L.A. were living because she had regular video calls with Maldonado after they returned to the United States.

¶26 Maldonado argues that to affirm the trial court's finding she lived in Tyrone, Oklahoma, as of September 21, 2023, this Court would have to accept that she inexplicably waited until October to reconnect her utility services at the trailer. Other evidence points to the fact Maldonado historically resided in Tyrone, Oklahoma,

¶27 This factual dispute turns on the credibility of the witnesses and how much weight ought to be attributed to the testimony. "The trial judge, by being confronted with the parties and the witnesses, was in a much better position to assess the credibility of those witnesses than is this Court from the dry, printed words in the record." White, 2000 OK 44Perry v. Perry, 1965 OK 160408 P.2d 285

IV. Temporary Emergency Jurisdiction

¶28 Because we have affirmed the trial court's finding that Oklahoma had home jurisdiction, we need not determine whether Oklahoma properly exercised temporary emergency jurisdiction.

V. Deprived Adjudication

¶29 We now review the evidence to determine whether the trial court erred in adjudicating the Children deprived as to Maldonado. There is evidence of drug use. When Maldonado went to the hospital to deliver N.A., her urine tested positive for methamphetamine. A hair follicle test also came back positive for methamphetamine. N.A.'s meconium tested positive for methamphetamine one day after birth, and he showed signs of withdrawals when he was two days old. OKDHS caseworker Melissa Hook testified that, at one point, Maldonado admitted to using methamphetamine, but her self-reported history of drug use changed several times. She stated she never used drugs but then also said she had been using for a while. As for Maldonado's most recent use of methamphetamine, Hook testified that Maldonado initially told her that she was voluntarily injected with methamphetamine during a consensual sexual encounter with two men. Then her story changed, and she said told Hook she was sexually assaulted by two men and forcibly injected with methamphetamine. At another point, Maldonado told Hook she was sexually assaulted by a man and a woman and forcibly injected with methamphetamine. Hook also testified that during the investigation Maldonado spent 3-4 minutes alone in her house before Maldonado allowed the OKDHS caseworker inside.

¶30 In its second amended petition for adjudication, the State alleged that after the trial court issued the order taking the Children into emergency custody, Maldonado and Amaro refused to provide information about L.A.'s whereabouts and prevented OKDHS and Oklahoma and Kansas law enforcement from locating L.A. The testimony was that Maldonado was not helpful in locating L.A.; she was deceptive and misleading. After being released from the hospital, Maldonado was arrested for failure to comply with the court's order. Testimony suggests Maldonado and Amaro devised a scheme to hide L.A. from OKDHS and law enforcement. Maldonado lied to Texas County Sheriff's Department investigator Berta Vela and told her a man named Luis took L.A. to Mexico to be with Amaro. Meanwhile, Amaro and Maldonado had arranged for acquaintances Nina Baca and Rosa Erica Villa to pick up L.A. late at night and take her to their home in Liberal, Kansas. Villa testified that Amaro also asked her to look into a plane ticket to Juarez, Mexico, for an unaccompanied minor and asked her if she would drive L.A. to El Paso, Texas, which she refused. Baca and Villa did not know L.A. was in state custody. An Amber Alert was issued in Oklahoma and Kansas, and Baca and Villa took L.A. to the Liberal Police Department.

¶31 In addition to Maldonado's report to OKDHS that she was forcibly injected with methamphetamine, there was other testimony from friends and babysitters that Maldonado did not have a drug addiction or history of drug use. Marcela Maciel, who was one of L.A.'s babysitters, testified that Maldonado always provided food and diapers and that L.A. was clean and well cared for. Maciel and OKDHS case worker Hook both testified that Maldonado's home was clean, in good condition, and adequately furnished. Hook testified Maldonado's appearance was healthy and well-kept. Maldonado argues a well-kept home and the quality care she provided to L.A. are inconsistent with methamphetamine addiction and the reckless use of drugs while pregnant. Maldonado asserts that there is no evidence of voluntary methamphetamine use and, in order to have adjudicated the Children deprived, the trial court must have believed that she suddenly, for no apparent reason, decided to try methamphetamine for the first time in the period leading up to N.A.'s birth. She contends that the sexual assault explains why an otherwise fit mother would have methamphetamine in her system.

¶32 Again, the trial court's deprived adjudication largely turns on its assessment of the credibility of witnesses. We hold there is competent evidence to support the order adjudicating the Children deprived as to Maldonado, and the order is affirmed.

CONCLUSION

¶33 The trial court's finding that L.A. had resided in Oklahoma for six months preceding the commencement of the deprived proceeding was not clearly erroneous, and the Oklahoma district court properly exercised jurisdiction in this matter. Competent evidence supports the trial court's order adjudicating the Children deprived as to Maldonado.

ORDER OF THE DISTRICT COURT IS AFFIRMED.

Rowe, C.J., Kuehn, V.C.J., Winchester, Edmondson, Darby, and Kane, JJ., concur.

Gurich, J., concur in result.

Combs, J., dissent: "I would dismiss this matter as moot."

FOOTNOTES

See 43 O.S.2024, § 551-204

e.g., Workers' Compensation Court, Court of Bank Review, Court of Tax Review, and Boards, Agencies and Commissions. See Okla. Const. art. 7, § 1. Only by giving these courts exclusive jurisdiction over certain types of controversies, has the district court's subject matter jurisdiction over those limited matters been withdrawn.

Maldonado is not appealing whether the Oklahoma district court properly exercised jurisdiction over newborn N.A. The issue has been waived.

The Oklahoma Supreme Court
2100 N. Lincoln Blvd., Suite 1
Oklahoma City, OK 73105