2003 UT 15

Frank OSBORNE, Petitioner,

v.

ADOPTION CENTER OF CHOICE, a Utah corporation, J.S. and S.S., Adoptive Parents, Respondents.

No. 20020515.

Supreme Court of Utah.

May 2, 2003.

David M. McConkie, Merrill F. Nelson, Salt Lake City, for Amicus Curiae Adoption Council.

DURRANT, Associate Chief Justice.

¶ 1 Frank Osborne, a North Carolina resident, challenges the court of appeals' decision denying his petition for extraordinary relief. Osborne sought extraordinary relief from the court of appeals by way of a petition for a writ of mandamus and injunctive relief. In challenging the denial, Osborne reasserts the arguments he made in his original petition before the court of appeals, questioning whether Utah courts have the authority to exert personal jurisdiction over non-resident fathers in adoption proceedings and whether non-resident putative fathers have a meaningful opportunity to raise jurisdictional defenses. Because Osborne raises these issues in the context of a petition for extraordinary relief, before reaching them, we must first determine whether Osborne is even entitled to receive extraordinary relief. Thus, the threshold question before us is whether the court of appeals properly denied Osborne's petition for extraordinary relief. Because Osborne has not shown that he is entitled to extraordinary relief, it is unnecessary for us to reach the other substantive issues. Since Osborne has failed to show the existence of any grounds on which extraordinary relief may be granted, we affirm.

## BACKGROUND

¶ 2 Osborne is a North Carolina resident. He began a relationship with Angela Baker, also a North Carolina resident, in November 2000. In December 2000, Baker became pregnant.

¶ 3 During her pregnancy, Osborne and Baker cohabited at Osborne's home in North Carolina. While Baker was living with Osborne, she informed him that she had contacted an adoption agency in Utah to inquire about placing the child for adoption upon its birth. Osborne expressed disapproval with that idea, and as a result, Baker assured Osborne that she would not place the child for adoption.

Phillip E. Lowry, Salt Lake City, for petitioner.

Larry S. Jenkins, Richard J. Armstrong, Salt Lake City, for respondents.

¶ 4 In early August 2001, Baker left Osborne's home and traveled to Utah with the intent to give birth and to place the child for adoption. On August 6, 2001, labor was induced and Baker delivered the child. That same day, she called Osborne and informed him that she had borne a son, that she had decided not to place the child for adoption in Utah, and that she was returning to North Carolina with the child.

¶ 5 Upon returning to North Carolina, Baker lived with her mother for a week and then moved back in with Osborne. However, by December 10, 2001, she once again moved out of Osborne's home. During this period of cohabitation, Osborne attempted on two occasions to convince Baker to execute a voluntary declaration of paternity. She refused to do so.

¶ 6 In early January 2002, Baker again informed Osborne that she intended to return to Utah and place the child for adoption, which she did. On January 4, 2002, Baker relinquished her parental rights to Adoption Center of Choice, Inc. ("Adoption Center"), a Utah adoption agency with its principal office located in Orem, Utah, so that the child could be placed for adoption. Shortly thereafter, Baker's husband [1] also formally relinquished any parental rights regarding the child and consented to the child's placement for adoption with Adoption Center. Adoption Center then placed the child with a couple but retained legal custody of and responsibility for the child, pursuant to Utah Code Ann. § 78–30–4.22 (2002), pending the finalization of the adoption.

¶ 7 On February 11, 2002, Osborne filed a paternity and custody action in North Carolina.[2]

---

1. It appears from the record in this case that Baker was legally married to a man other than Osborne during Osborne and Baker's relationship.

2. On July 1, 2002, a North Carolina district court issued a temporary restraining order against Baker, Adoption Center, and the adoptive parents, identified as John and Jane Doe, aimed at preventing them from "taking any steps to further prosecute or perfect any Utah court proceeding affecting [Osborne's] parental rights, specifically any adoption proceeding now pending and involving the minor child [K.S.B.]." This

## PROCEDURAL HISTORY

¶ 8 On February 14, 2002, Osborne filed a verified petition in a Utah district court challenging the subject matter jurisdiction of the Utah courts regarding the adoption of the child.

¶ 9 In connection with this petition, on February 20, 2002, Osborne issued a subpoena to Adoption Center, seeking the name and address of the adoptive parents, the names of the attorneys involved in the adoption proceeding, the county in which the adoption proceeding was filed, and the names of all judges who had issued any rulings or orders associated with the adoption. In response, on February 26, 2002, Adoption Center moved to quash the subpoena, arguing that Osborne had waived his notice and consent rights related to the adoption under Utah adoption law.

¶ 10 On March 1, 2002, the district court, at Osborne's request, heard argument on Adoption Center's motion to quash. Osborne was represented by counsel at the hearing. Subsequent to the hearing, Osborne filed two supplemental memoranda of law in which he argued that in the event the district court were to conclude that it had subject matter jurisdiction over the adoption, he was prepared to argue that the district court lacked personal jurisdiction over him because he was a North Carolina resident who did not have the necessary minimum contacts with Utah.

¶ 11 On March 8, 2002, Adoption Center filed a petition for determination of birth father's rights relating to the child pursuant

---

order was issued the day before the Utah Court of Appeals issued its memorandum decision concerning Osborne's petition for a writ of mandamus and injunctive relief in Utah. *See infra* ¶¶ 16–18.

On July 17, 2002, the North Carolina district court replaced the temporary restraining order with a preliminary injunction to the same effect. At the time the preliminary injunction was put into effect, the North Carolina district court was in receipt of copies of both the Utah district court's orders and the Utah Court of Appeals' July 2, 2002, memorandum decision.

to Utah Code Ann. § 78–30–4.24 (2002)[3] and the Utah Declaratory Judgment Act, Utah Code Ann. §§ 78–33–1, –2 (2002). Adoption Center sent a copy of the petition along with a notice of the petition and an acceptance of service to Osborne's attorney. Osborne's attorney refused to accept service of process. Adoption Center moved to allow its petition to be heard without notice on March 21, 2002.

¶ 12 On March 18, 2002, the district court granted Adoption Center's motion to quash. In doing so, the district court held that "Frank Osborne has not complied with the legal requirements for preserving his parental rights under Utah law" and that "Osborne has failed to take any action according to the statutory requirements, and so has waived any right to [the child] he may have otherwise had." Osborne did not appeal the district court's ruling. Instead, on March 27, 2002, Osborne filed a notice of voluntary dismissal of his petition.

¶ 13 On March 29, 2002, the district court granted Adoption Center's motion to proceed without notice. On April 8, 2002, the district court signed an order stating that

pursuant to Utah Code Ann. § 78–30–4.14(5), any person, including Frank Osborne, claiming to be the putative natural father of the minor child is deemed to have waived and surrendered any right in relation to the minor child, including the right to notice of any judicial proceeding in connection with the adoption of the child, and his consent to the adoption of the child is not required.

¶ 14 After voluntarily dismissing his petition in state court, Osborne filed a complaint, on April 4, 2002, in the United States District Court for the District of Utah, claiming violations of his Fourteenth Amendment due process rights. Osborne requested, among other things, injunctive relief to stay finalization of the adoption and the proceeding regarding the Adoption Center's Petition for Determination of Birth Father's Rights. On June 4, 2002, Adoption Center moved the federal district court to dismiss Osborne's complaint or, in the alternative, for summary judgment.

¶ 15 On June 18, 2002, Osborne sought a temporary restraining order from the federal district court to enjoin Adoption Center and the adoptive parents from finalizing the adoption. At a hearing on the subject on June 21, 2002, the federal district court refused to issue the requested temporary restraining order.[4]

## COURT OF APPEALS' DISPOSITION[5]

¶ 16 On the same day the federal district court denied Osborne's request for injunctive relief, Osborne filed a petition for a writ of mandamus and injunctive relief with the court of appeals. Specifically, in the filing before the court of appeals, Osborne requested that the court of appeals

issue a writ of mandamus against every district court in the state of Utah to enjoin any proceedings conducted to finalize the adoption of the child at issue ..., issue a temporary restraining order against the respondents from formalizing the adoption, issue a temporary restraining order against the Adoption Center of Choice to reveal the identity of the adoptive parents so they may be served and stayed, and finally to issue an order declaring that [he] may either directly intervene in the adoption or bring a collateral action ... to challenge the pending adoption proceeding on jurisdictional grounds without waiving any personal jurisdiction defense.

¶ 17 On July 2, 2002, the court of appeals denied Osborne's petition.[6] The court of appeals held that Osborne "failed to establish he has met any of [the] requirements" of Utah Code Ann. § 78–30–4.14 to establish

---

3. Section 78–30–4.24 of the Utah Code allows "[a]ny interested party [to] petition the court for a determination of the rights and interests of any person who may claim an interest in a child under [the Utah adoption code]." *Id.* § 78–30–4.24.

4. The present status of Osborne's federal action is unclear from the record.

5. The instant action originated in the court of appeals.

6. It is not clear from the record whether the court of appeals was aware at the time it ruled on Osborne's petition that the North Carolina district court had issued a temporary restraining order. *See supra* note 2.

any rights to the child. *Osborne v. Adoption Center of Choice*, Case No. 20020489–CA, at 1–2 (Utah Ct.App. July 2, 2002). Furthermore, the court of appeals determined that Osborne had failed to meet the requirements of Utah Code Ann. § 78–30–14.15, which governs non-resident fathers in this context, because "he took absolutely no legal action in his home state of North Carolina for the five months prior to the mother's relinquishment." *Id.* at 2. Ultimately, the court of appeals concluded that Osborne "has simply failed to take any timely action to preserve his rights to this child." *Id.*

¶ 18 As to Osborne's arguments concerning personal jurisdiction, the court of appeals concluded that

> the question of personal jurisdiction only arises when a defendant is called to defend an action in court. The district court did not need or attempt to exercise personal jurisdiction over [Osborne]. He lost his rights to the child by operation of law when he failed to take the statutory steps required to protect his rights.... Furthermore, it is [Osborne], as a plaintiff, seeking relief in Utah courts who has invoked the jurisdiction of the Utah courts. The fact that court action, and the operation of law, affected the father's unprotected parental rights does not implicate personal jurisdiction. If [Osborne] wants to protect and assert his rights in a child relinquished for adoption in Utah, he must take the necessary action to protect his rights under Utah law. He cannot simply stand on the "sidelines" and claim that Utah courts lack jurisdiction over him.

*Id.* at 2–3.

¶ 19 On July 3, 2002, Osborne moved to temporarily stay the district court's order finalizing the adoption pending an en banc hearing before this court on Osborne's petition for writ of certiorari, which he filed on August 1, 2002. We granted the writ of certiorari and stayed the finalization of the adoption pending this decision.[7]

---

7. The court heard oral argument in this case on December 4, 2002. Immediately after oral argument by the parties, the court met in conference and deliberated on the appeal. The majority of the court agreed that the decision of the court of

¶ 20 On appeal to this court, Osborne questions the court of appeals' denial of his attempt to present through a petition for extraordinary relief a challenge to the exercise of personal jurisdiction over him by Utah courts. Osborne argues that Utah courts do not have personal jurisdiction because he is a North Carolina resident who does not have minimum contacts with Utah sufficient for Utah courts to exercise personal jurisdiction over him consistent with the due process protections of the Fifth and Fourteenth Amendments to the United States Constitution.

¶ 21 Adoption Center maintains that the writ of certiorari should be dismissed as improvidently granted, arguing that Osborne's petition for extraordinary relief from the court of appeals was improper and never should have been entertained by the court of appeals in the first place. As to the jurisdictional question posed by Osborne, Adoption Center argues that personal jurisdiction over Osborne is irrelevant because Osborne never perfected his rights in the child. In other words, Osborne would be entitled to due process protections only if Utah were depriving him of some liberty or property interest, an interest Osborne does not possess in connection with the child because of his failure to secure his rights in the child. Finally, Adoption Center argues that Utah has jurisdiction over the adoption under the status exception to the minimum contacts requirement for the exercise of personal jurisdiction.

## ANALYSIS

### I. STANDARD OF REVIEW

¶ 22 Before the court of appeals, Osborne petitioned for extraordinary relief under rule 65B of the Utah Rules of Civil Procedure and rule 19 of the Utah Rules of Appellate Procedure. His petition requested an order that would allow him to "directly intervene ... or bring a collateral action ... to challenge the pending adoption proceeding on jurisdictional grounds without waiving any

appeals should be affirmed. An order lifting our stay of the district court's order finalizing the adoption pending the issuance of this decision was signed the same day, with a notation that an opinion would follow. This is that opinion.

personal jurisdiction defense." The court of appeals denied Osborne's request both because no court attempted to exercise personal jurisdiction over him and because it determined that he had lost his right to challenge the adoption "by operation of law when he failed to take the statutory steps required to protect his rights." *Osborne v. Adoption Center of Choice*, Case No. 20020489–CA, at 2 (Utah Ct.App. July 2, 2002) (citing *Swayne v. L.D.S. Social Servs.*, 795 P.2d 637, 640 (Utah 1990)). Whether it properly refused to "issue a writ ... against every district court in the state of Utah to enjoin any proceeding conducted to finalize the adoption of the child at issue in this matter" is a matter that we review for an abuse of discretion. *See Renn v. Utah State Bd. of Pardons*, 904 P.2d 677, 683 (Utah 1995).

## II. PETITION FOR EXTRAORDINARY RELIEF

■ ¶ 23 Petitions for extraordinary relief are governed by rule 65B of the Utah Rules of Civil Procedure. Utah R. Civ. P. 65B(a); *accord Renn*, 904 P.2d at 682. Because rule 65B provides for several different types of extraordinary relief, before granting a petition for extraordinary relief, "a court must look to the nature of the relief sought, the circumstances alleged in the petition, and the purpose of the type of writ sought." *Renn*, 904 P.2d at 683. If the nature of the relief sought, the alleged circumstances, or the purpose of the type of writ sought do not meet the conditions under rule 65B for obtaining any of the types of extraordinary relief available, then such relief cannot be granted.

¶ 24 According to rule 65B, a person may petition for extraordinary relief "[w]here no other plain, speedy and adequate remedy is available." Utah R. Civ. P. 65B(a). It is questionable whether Osborne has met this condition for obtaining extraordinary relief. Regardless, even assuming that he has, he has failed to meet the other conditions in rule 65B for obtaining the type of extraordinary relief he has requested. To the extent Osborne attempts to cloud the issue by presenting additional jurisdictional arguments in his brief that were not raised in his petition,

such arguments are not properly before this court.

¶ 25 Osborne sought the following relief in his petition before the court of appeals:

1. "[A] writ of mandamus against every district court in the state of Utah to enjoin any proceeding conducted to finalize the adoption of the child [K.S.B.];"

2. "[A] temporary restraining order against the respondents from finalizing the adoption;"

3. "[A] temporary restraining order against the Adoption Center of Choice to reveal the identity of the adoptive parents so they may be served and stayed;" and

4. "[A]n order declaring that [he] may either directly intervene in the adoption or bring a collateral action ... to challenge the pending adoption proceeding on jurisdictional grounds without waiving any personal jurisdiction defense."

Because of the nature of the extraordinary relief Osborne is seeking and the purpose of the writ of mandamus for which he petitions, Osborne's petition is governed by rule 65B(d) of the Utah Rules of Civil Procedure.

■ ¶ 26 Extraordinary relief may be granted under rule 65B(d) to right "the wrongful use of judicial authority [or] the failure to exercise such authority." Utah R. Civ. P. 65B(a). However, only "[a] person aggrieved or whose interests are threatened by any of the acts enumerated" under rule 65B(d) may petition for extraordinary relief. *Id.* 65B(d)(1). For the reasons cited below, we hold that the court of appeals did not abuse its discretion when it denied Osborne's petition because Osborne has not been aggrieved by and his interests have not been threatened by any of the acts enumerated under rule 65B(d). Thus, he is not entitled to extraordinary relief.

■ ¶ 27 First, a petition for extraordinary relief cannot be directed to "every district court in the state of Utah." Rule 19 of the Utah Rules of Appellate Procedure plainly allows for a petition for an extraordinary writ "directed to *a judge*, agency, person, or entity." Utah R.App. P. 19(a) (emphasis added). This rule also makes explicit provisions for service "on *the respondent judge*,

agency, person or entity." *Id.* (emphasis added). According to the plain language of rule 19, an extraordinary writ cannot be addressed to every court of the state at once; only to a particular court or to a particular judge. Extraordinary relief is available only to right a particular wrong, not a generalized, amorphous one.

¶ 28 Second, even if Osborne had properly petitioned to have an extraordinary writ directed only to the district court in which the adoption he seeks to contest is taking place, his petition could not have been granted. Under the provisions of rule 65B(d), a person may obtain relief only under four limited circumstances, and the facts of this case potentially implicate only three of these circumstances.[8] Because none of the grounds alleged in the petition relate to any of these limited circumstances, however, the court of appeals properly exercised its discretion in denying Osborne's petition.

■ ¶ 29 The first circumstance under which extraordinary relief may be granted is where the district court "has exceeded its jurisdiction or abused its discretion." Utah R. Civ. P. 65B(d)(2)(A). In his petition, Osborne does not describe a situation where any district court in Utah has exceeded its jurisdiction or abused its discretion. While Osborne seeks to cloud the issue by arguing that Utah courts had no jurisdiction over him, he fails to recognize that no Utah court exercised jurisdiction over him. As the court of appeals noted, "[t]he district court did not need or attempt to exercise personal jurisdiction over [Osborne].... The fact that court action, and the operation of law, affected the [putative] father's unprotected parental rights does not implicate personal jurisdiction." *Osborne,* Case No. 20020489–CA, at 2. Since no Utah court exercised personal jurisdiction over Osborne or abused its discretion, he may not obtain extraordinary relief on this ground.

■ ¶ 30 Second, extraordinary relief may be granted where the district court "failed to perform an act required by law as a duty of office, trust or station." Utah R. Civ. P.

65B(d)(2)(B). Osborne's petition does not present any circumstances suggesting that *any* Utah court failed to perform an act required by law. Therefore, he may not obtain extraordinary relief on this ground.

■ ¶ 31 Finally, extraordinary relief may be granted where the district court refused or denied the petitioner a right to which he or she is entitled. *Id.* 65B(d)(2)(C). Although Osborne claims that he has a right entitling him to challenge the adoption proceeding and to challenge the exercise of personal jurisdiction over him, he cannot point to any Utah court that has refused or denied him a legally cognizable right.

■ ¶ 32 Regarding putative fathers' parental rights, the United States Supreme Court has explained that "the existence or nonexistence of a substantial relationship between parent and child is a relevant criterion in evaluating both the rights of the parent and the best interests of the child." *Lehr v. Robertson,* 463 U.S. 248, 266–67, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). The Court further noted "[t]he legitimate state interests in facilitating the adoption of young children and having the adoption proceeding completed expeditiously that underlie the entire statutory scheme also justify a trial judge's determination to require all interested parties to adhere precisely to the procedural requirements of the statute." *Id.* at 251, 265, 103 S.Ct. 2985 (discussing a state statute that required putative fathers to register their "intent to claim paternity of a child born out of wedlock"). Until Osborne makes some showing that he is an interested party who has complied precisely with the procedural requirements necessary to challenge an adoption proceeding, Utah courts have an overriding interest in facilitating adoption.

■ ¶ 33 Utah law clearly provides a method for putative fathers in Osborne's position to show the existence of a substantial relationship with a child that vests them with rights to challenge an adoption. *See* Utah Code Ann. § 78–30–4.15 (2002). Section 78–

---

8. The fourth basis on which extraordinary relief may be granted—"where the Board of Pardons and Parole has exceeded its jurisdiction," Utah R. Civ. P. 65B(d)(2)(D)—is obviously inapplicable to the facts of this case and need not be discussed.

30–4.15(4) allows an "unmarried biological father who resides in another state" to challenge the mother's placement of the child for adoption if he resided in another state with the mother and has "complied with the most stringent and complete requirements of the state where the mother previously resided or was located, in order to protect and preserve his parental interest and right in the child" at issue. *Id.* § 78–30–4.15(4). In enacting this statute, the Utah legislature expressly provided "that an unmarried biological father who resides in another state may not, in every circumstance, be reasonably presumed to know of, and strictly comply with, the requirements" for putative fathers who reside in this state. *Id.* Thus, the Utah legislature has enacted an alternative avenue for putative fathers who live out of state to establish their parental rights.

¶ 34 Yet, Osborne has made no attempt to show that he has complied with the legal requirements of this state or of any other state in order to establish a legally recognized relationship with the child whose adoption he intends to interrupt. Thus, the court of appeals correctly noted that Osborne "has simply failed to take any timely action to preserve his rights to this child." *Osborne,* Case No. 20020489–CA at 1. By refusing to comply with the putative father requirements of this state or the state where the mother previously resided, Osborne has placed himself in the position where Utah courts cannot recognize him as an interested individual with rights to challenge an adoption proceeding. Stated differently, by refusing to take the opportunity to establish that he has preserved his parental rights, Osborne has deprived himself of the ability to challenge the adoption.

¶ 35 If we decided to allow every out-of-state putative father to contest an adoption without making some demonstration to a Utah court that he has preserved his parental rights, we would open the gate for any out-of-state person to claim he is the putative father and to interrupt a Utah adoption proceeding by simply alleging that he is the biological father and that Utah law does not apply to him. We should not halt adoptions on the mere allegation of biological fatherhood.

¶ 36 If Osborne wants to challenge an adoption, he must appear in a Utah court to establish that he has a right to do so. Osborne has not yet done so, and no Utah court has prohibited him from doing so. Because Osborne has not shown to a district court that he is entitled to any rights that would allow him to challenge the adoption of K.S.B., no ground exists upon which his petition for extraordinary relief may be granted.

¶ 37 Before we may even consider granting extraordinary relief, a petition must allege circumstances and seek relief of a nature and purpose for which extraordinary relief may be granted under rule 65B. *See Renn,* 904 P.2d at 683. Osborne's petition does not meet the criteria for granting extraordinary relief because none of the circumstances alleged in the petition relate to any of the grounds for obtaining such relief. Since Osborne cannot point to any Utah court that has exceeded its authority or jurisdiction, failed to perform any duty, or refused or denied him any rights that would establish grounds upon which extraordinary relief may be granted, the court of appeals properly exercised its discretion in denying his petition.

## CONCLUSION

¶ 38 In his brief, Osborne focuses on questions beyond the threshold issue before us: whether the court of appeals abused its discretion in denying Osborne's petition for extraordinary relief. Because Osborne's petition was not based on any available grounds for relief, the court of appeals did not abuse its discretion. Therefore, we affirm its decision to deny his petition.

¶ 39 Justice RUSSON, Justice WILKINS, and Judge BALDWIN concur in Associate Chief Justice DURRANT's opinion.

¶ 40 Justice HOWE does not participate herein, Second District Judge PARLEY R. BALDWIN sat.

DURHAM, Chief Justice, dissenting:

¶ 41 The majority opinion declares that the petitioner is not entitled to an extraordinary writ procedure because he has failed to comply with a statute whose requirements he challenges as an unconstitutional deprivation of his rights to due process. The result is that the father of a child, with whom he lived and whom he supported for the first five months of its life, and whom the child's mother unilaterally and clandestinely removed from his home and their resident state, has no legal means to prevent, or even require a hearing on, the placement of that child with strangers for adoption in Utah.

¶ 42 Neither our constitutional system nor our national network of laws respecting jurisdiction over children and their parents permit such a result.

¶ 43 Frank Osborne has characterized his situation as a catch–22. When the district court granted the motion of the Adoption Center of Choice ("Adoption Center") to allow its Petition For Determination of Birth Father's Rights under Utah Code section 78–30–4.24 to be heard without notice to Osborne, and subsequently terminated Osborne's parental rights,[1] Osborne feared that to appeal the court's decision would be to subject himself to Utah's personal jurisdiction. This was precisely the result that Osborne sought to avoid when he initially refused to accept service of process on the Adoption Center's petition. Osborne acted out of the conviction that North Carolina, rather than Utah, was the proper forum for determining his parental rights. Osborne's efforts to avoid subjecting himself to the jurisdiction of Utah courts led him first to challenge Utah's subject matter jurisdiction over his child's adoption, then to federal district court, and finally to his petition for extraordinary relief from the court of appeals in the proceeding below. Addressing Os-

borne's request for a writ of mandamus to prevent the finalization of his child's adoption, together with an order allowing him to intervene in the child's adoption proceeding without waiving his objection to personal jurisdiction, the court of appeals first held that Osborne had not "fully and strictly compl[ied]" with Utah Code section 78–30–4.14(2)'s statutory requirements in order to satisfy Utah Code section 78–30–4.14(5). The court of appeals then proceeded to examine whether Osborne had nevertheless acquired parental rights under a different Utah Code section, which makes certain allowances for unmarried biological fathers who do not reside in Utah. *See* Utah Code Ann. § 78–30–4.15(4). Similar to section 78–30–4.14(5)'s strict compliance requirement, however, this statute requires that the father comply with "the most stringent and complete requirements of the state where the mother previously resided or was located." Utah Code Ann. § 78–30–4.15(4)(d). The court of appeals held that Osborne had not satisfied this requirement.

¶ 44 A complex array of interests are involved whenever a putative father seeks to challenge an interstate adoption. The state has a legitimate interest, dictated by a concern for the best interests of a child, in ensuring the stability of the adoption process and avoiding uprooting a child who has lived for a significant period with adoptive parents. *See In re Adoption of Baby Boy Doe*, 717 P.2d 686, 691 (Utah 1986). At the same time, one state's statutory law must not be allowed to infringe unfairly on the constitutional rights of an unmarried biological father who resides in another state. *See id.* The majority's application of Utah adoption laws when deciding the rights to which Osborne is entitled tilts the balance too far toward the interests of private adoption agencies, ignoring the uniform laws already in place to regulate interstate child custody and adoptions and

---

1. The district court held that, under Utah Code section 78–30–4.14(5), plaintiff had "waived and surrendered any right in relation to the [minor] child, including the right to notice of any judicial proceeding in connection with the adoption of the child, and his consent to the adoption of the child is not required." This holding was based on the language of section 78–30–4.14(5), which requires an unmarried biological father to "fully

and strictly comply" with statutory requirements in order to preserve his parental rights. Utah Code Ann. § 78–30–4.14(5) (2002). In the case of a child less than six months old, these requirements include registration with Utah's putative father registry before the birth mother relinquishes the child for adoption. *See id.* § 78–30–4.14(2)(b).

the due process rights of a biological father. Because I believe that Utah courts have no subject matter jurisdiction to determine Frank Osborne's parental rights, and that applying the Utah Adoption Code here violates Osborne's right to due process, I respectfully dissent.

## I. SUBJECT MATTER JURISDICTION

¶ 45 Utah Code section 78–30–4.24, part of Utah's Adoption Code, allows "[a]ny interested party" to "petition the court for a determination of the rights and interests of any person who may claim an interest in a child under this chapter, at any time prior to the filing of a petition for adoption." Utah Code Ann. § 78–30–4.24 (2002). In the original district court proceeding, the court interpreted this statute as giving it subject matter jurisdiction over a Utah adoption agency's attempt to terminate an out-of-state putative father's parental rights. However, this interpretation conflicts with provisions in the Interstate Compact on Placement of Children ("Interstate Compact"), Utah Code Ann. § 62A–4a–701 (2000), and the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), Utah Code Ann. §§ 78–45c–101 to –318 (2002).

### A. Conflicts Between the Adoption Code and the Interstate Compact

¶ 46 Under the Interstate Compact, a child is not supposed to be sent or brought into another state for placement until the "sending agency," here, the mother,[2] notifies the public authorities in the receiving state of the identity of the child and parents, the agency to which the child will be brought, and the reasons for this action, and the authorities then "notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child." Utah Code Ann. § 62A–4a–701(Article III)(2)(f); In Re Adoption of

R.N.L., 913 P.2d 761, 764 (Utah Ct.App.1996) ("The purpose of the Interstate Compact is to inform state authorities of the proposed adoption so they can protect the child's interest by ascertaining and evaluating the circumstances of the proposed placement."). Under the Adoption Code, if a child was born in another state, the petition for adoption must affirm compliance with the requirements of the Interstate Compact. Utah Code Ann. § 78–30–15.1. Here, however, this requirement was avoided because the child was born in Utah, after the mother flew here apparently intending to give the child up for adoption at birth and a doctor induced labor (on August 6, 2001). The Interstate Compact still applies, however, because the mother returned to North Carolina with the infant after spending only one day in Utah and did not return to Utah with the five-month-old child until January 2002, again with the intention of giving the child up for adoption.

¶ 47 One purpose of the Interstate Compact is to promote "[a]ppropriate jurisdictional arrangements for the care of the children" who cross state lines in the course of interstate adoptions or relinquishments. Id. § 62A–4a–701(Article I)(4). Under the Interstate Compact, the "sending agency" "retain[s] jurisdiction over the child sufficient to determine all matters in relation to the custody, supervision, care, treatment, and disposition of the child which it would have had if the child had remained in the sending agency's state, until the child is adopted.... Such jurisdiction shall also include the power to effect or cause the return of the child or its transfer to another location and custody pursuant to law." Id. § 62A–4a–01 (Article V)(1).

¶ 48 Here, the "sending agency" is the child's mother, who relinquished the child to the Adoption Center and, under the terms of the relinquishment contract, terminated "all [her] rights to the custody" of the child.

---

**2.** Included in the statutory definition of "sending agency" is "a person ... which sends, brings, or causes to be sent or brought any child to another party state." Utah Code Ann. § 62A–4a–701(Article II)(2). The statute specifically excludes "[t]he sending or bringing of a child into a receiving state by his parent, step-parent, grandparent, adult brother or sister, adult uncle or

aunt, or his guardian and leaving the child with any such relative or nonagency guardian in the receiving state." Id. § 62A–4a–701(Article VIII)(1). A parent who brings a child into a receiving state for the purpose of relinquishing it to an adoption agency for adoption therefore qualifies as a "sending agency."

Assuming that such a contract would be valid in North Carolina, the mother's relinquishment of custody likely would entail termination of jurisdiction over her under the Interstate Compact *if* the terms of the Interstate Compact had otherwise been met. Since the requirements of the Interstate Compact were not otherwise met, however, the mother's attempt to transfer jurisdiction to Utah as a receiving state is flawed. Jurisdiction over the child thus still follows the mother, not the Adoption Center, and Osborne should be entitled to sue the mother in North Carolina for custody or a parental rights determination since both he and the mother are North Carolina residents.

¶ 49 Under the Adoption Code, the adoption agency has "the right to the custody and control of the child," once the child has been relinquished to the agency. *Id.* § 78–30–4.22(2). However, this provision must be read together with the provisions of the Interstate Compact when an interstate transfer of the child is involved. The adoption agency is not entitled to custody unless there has been compliance with the Interstate Compact. Otherwise the Interstate Compact can simply be bypassed, and its purposes defeated, by relying on conflicting state law.

¶ 50 Under a reading consistent with the Interstate Compact, then, the Adoption Center has no interest in the child that would allow it to bring an action to terminate Osborne's parental rights under Utah Code Ann. § 78–30–4.24.

### B. Conflicts Between the Adoption Code and the UCCJEA

¶ 51 Similarly, under the UCCJEA, a Utah court has no lacks jurisdiction to terminate Osborne's parental rights. The UCCJEA considers a proceeding regarding paternity or for termination of parental rights to be one in which a child's custody ("legal custody, physical custody, or parent-time") is an issue. Utah Code Ann. § 78–45c–102(3),(4). The UCCJEA gives a Utah court jurisdiction to

make "an initial child custody determination" only if (1) Utah is the child's home state on the date the proceeding begins, (2) a court of another state does not have jurisdiction or is not a more appropriate forum, (3) all other courts that might have jurisdiction under the preceding provisions have declined to exercise it, or (4) no state would otherwise have jurisdiction. *Id.* § 78–45c–201(1). The "home state" is "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding," or for a child less than six months old, "the state in which the child lived from birth with any of the persons mentioned." *Id.* § 78–45c–102(7). Thus, Utah was not the child's home state when the Adoption Center initiated its proceeding. North Carolina was the child's home state, and North Carolina courts did not refuse to exercise jurisdiction. In fact, a North Carolina court has ruled that it has exclusive jurisdiction over the question of Osborne's parental rights and issued a temporary restraining order against the Adoption Center to prevent it from proceeding with the child's adoption.[3] *Osborne v. Baker*, No. 02–CvD–478 (N.C. Gen. Ct. of Justice, Dist. Ct. Div. July 1, 2002).

¶ 52 A Utah court could exercise temporary emergency jurisdiction "if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse." Utah Code Ann. § 78–45c–204(1). Here, the child may be viewed as abandoned by the mother, although not by Osborne. Even so, any child custody determination made by a Utah court is only in effect until a court of a state having non-emergency jurisdiction under the UCCJEA issues an order regarding the child's custody. *Id.* § 78–45c–204(2).

¶ 53 The UCCJEA does not govern "an adoption proceeding." *Id.* § 78–45c–103(1).[4]

---

**3.** The court subsequently replaced the restraining order with a preliminary injunction. *See supra* ¶ 7 n. 2.

**4.** The National Conference of Commissioners on Uniform State Laws amended the UCCJEA in

1999 to exclude adoption proceedings. Unif. Child Custody Jurisdiction & Enforcement Act § 103 (1999). This provision was enacted in Utah in 2000. Utah Code Ann. § 78–45c–103. Prior to its enactment, the UCCJEA was widely

However, the proceeding at issue here was brought under Utah Code Ann. § 78–30–4.24, which allows an interested party to petition the court to determine a father's parental rights "at any time *prior*" to a petition for adoption. (emphasis added). This is not an "adoption proceeding," but a separate proceeding that precedes an adoption proceeding. The Oklahoma Supreme Court, considering a similar action brought under Oklahoma state law, held that a pre-adoption proceeding to terminate parental rights is ancillary to an adoption proceeding (even though the trial court had declined jurisdiction over the actual adoption proceeding in favor of the state where the adoptive parents resided), so the UCCJEA did not apply. *White v. Adoption of Baby Boy D.*, 10 P.3d 212, 220–21 (Okla.2000) (holding that the trial court properly exercised emergency jurisdiction over the proceeding). Five Oklahoma justices joined the majority opinion, one concurred in the result, and three dissented. *Id.* at 223. Two of the dissenting justices argued that the majority's expansive application of emergency jurisdiction "effectively eviscerate[s] any subject matter jurisdictional requirements for adoption and termination proceedings." *Id.* at 225. They continued:

> A birth mother from any state in the nation may now travel to Oklahoma with prospective adoptive parents and place a child with an agency for adoption in Oklahoma. Because she is deemed to have abandoned her child, the courts of this state may assume emergency jurisdiction and then proceed to terminate the parental rights of the father no matter how attenuated or non-existent his connection with this state.

*Id.*

¶ 54 Here, the majority has not even reached the question of emergency jurisdiction, presumably under the belief that the trial court had subject matter jurisdiction under Utah Code sections 78–30–4.24 and 78–33–1 and that the UCCJEA does not apply. However, such an understanding in effect allows one parent and a Utah adoption agency to make an end run around the jurisdictional requirements of the UCCJEA, to the disadvantage of the other parent. If a proceeding to terminate parental rights is considered an indistinguishable part of an adoption proceeding, rather than an independent proceeding governed by the UCCJEA, the underlying purposes of the UCCJEA are defeated.

¶ 55 The UCCJEA has a provision that explicitly governs a situation where two courts in different states have initiated potentially conflicting proceedings regarding a birth parent's parental rights and the custody of a child. *See* Utah Code Ann. § 78–45c–206. The North Carolina court complied with this provision and determined that, under the UCCJEA, it and not Utah was the appropriate forum for the determination of Osborne's parental rights. This court's failure to address Utah's subject matter jurisdiction over the Adoption Center's action and to interpret Utah Code section 78–30–4.24 in a manner consistent with the UCCJEA will eviscerate the UCCJEA's purpose of preventing the very conflict that now exists between the Utah and North Carolina courts.

¶ 56 Both the Interstate Compact and the UCCJEA have been designed specifically to govern interstate transfers of children and avoid the unfair exercise of jurisdiction over the various parties involved. An interpretation of Utah Code section 78–30–4.24 that allows a Utah adoption agency to terminate the parental rights of a child's putative father when the father may well be entitled to parental rights under the law of his and the

---

held to apply to adoption proceedings. *See, e.g., In re L.S.*, 943 P.2d 621, 624 (Okla.1997); *E.E.B. v. D.A.*, 89 N.J. 595, 446 A.2d 871, 873 (N.J. 1982). The provision appears to result from unfortunate situations such as that in *In re Clausen*, 442 Mich. 648, 502 N.W.2d 649, 656 (1993), where applying the UCCJA (predecessor of the UCCJEA) in the adoption context had resulted in a child's removal from its adoptive parents, after living with them for two and a half years, in order to give custody to the biological father, who had never had any contact with the child. Such a rationale only strengthens the argument that the UCCJEA should apply in pre-adoption parental rights proceedings, especially where the parent in question has developed a relationship with the child, so that parental rights can be determined as quickly as possible in the most appropriate jurisdiction.

child's home state is inconsistent with both the Interstate Compact and the UCCJEA. These conflicts can be avoided simply by recognizing that an action under section 78–30–4.24 for the determination of an out-of-state birth father's rights is a custody determination independent of an adoption proceeding and is governed by the UCCJEA.

## II.  DUE PROCESS—PERSONAL JURISDICTION

¶ 57 The UCCJEA's rational scheme assigning default jurisdiction to a child's home state does not require that state to have personal jurisdiction over both parents of the child in order to make a parental rights termination decision.  If we forego the provisions of the UCCJEA when making pre-adoption parental rights determinations, however, due process requires that, in such a proceeding as this, a Utah court at least have personal jurisdiction over the parent whose rights it is terminating.[5]

¶ 58 Contrary to the Adoption Center's argument, I do not believe that this court's decisions in *D.A. v. State (In re W.A.)*, 2002 UT 127, 63 P.3d 607, and *State v. E.A. (In re W.A.)*, 2002 UT 126, 63 P.3d 100, lead to the conclusion that Utah can assert jurisdiction over Osborne under the status exception to the minimum contacts requirement.  The rationale underlying these cases in fact leads to the opposite conclusion.  As the analysis in that opinion makes clear, the status exception may apply when a *plaintiff* is seeking determination of his or her status with respect to an out-of-state defendant.  *D.A.*, 2002 UT 127 at ¶¶ 20–21, 63 P.3d 607.  The court quotes *Pennoyer v. Neff*, 95 U.S. 714, 734–35, 24 L.Ed. 565 (1877), as observing that "cases involving the status of a *plaintiff* are unique and can be pursued in the *plaintiff's home state* even if that judicial forum does not have personal jurisdiction over the defendant." *D.A.*, 2002 UT 127 at ¶ 20, 63 P.3d 607 (emphasis added); *see id.* at ¶ 21 (quoting similar language in *Shaffer v. Heitner*, 433 U.S. 186, 201, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)).  The point of the status

exception is to allow individuals residing in one state to resolve their own legal relationship with others who are not within the state. Otherwise, such individuals would be left in limbo or would be forced, at substantial inconvenience and expense, to travel to the defendant's home state to file their action.

¶ 59 *D.A.* provides a suitable example of this rationale.  In that case, a minor, one of whose parents had abused him and both of whom had been forced to relinquish custody of him six years earlier when they were facing felony charges, had been brought to Utah by his aunt and had lived here with her for a significant time.  *Id.* at ¶ 4. The minor's guardian ad litem, together with the State, filed a motion to terminate the parents' parental rights.  *Id.* at ¶¶ 2–5.  The guardian ad litem and the State, both charged with protecting the minor's best interests, thus acted on his behalf to determine his status with respect to his parents.

¶ 60 In the original trial court proceeding at issue here, in contrast, the Adoption Center, a for-profit adoption agency, sought to terminate a biological father's parental rights in order to proceed with its business of facilitating the adoption of a child whose "home state" had never been Utah.  The Adoption Center is a private entity under no public obligation to protect a child's best interests. These interests are not served by unfairly preventing a biological parent who has developed a relationship with his child from asserting his parental rights.  It is the role of the courts to protect the interests of both parent and child by considering further whether "traditional notions of fair play and substantial justice" have been satisfied.  *See id.* at ¶ 16.

¶ 61 Having decided that the status exception applied in *D.A.*, the court nevertheless found it necessary to determine "if exercising jurisdiction in this case otherwise meets the due process requirements of the Fourteenth Amendment." *Id.* at ¶ 28.  The court listed two reasons for its decision that due process was otherwise satisfied:  First the court found it "clear" that Utah was the most

---

5.  According to the majority, the trial court did not exercise personal jurisdiction over Osborne and did not need to because Osborne had no

parental rights under Utah law.  In my opinion, this conclusion simply begs the constitutional question that Osborne has raised.

suitable jurisdiction for resolving the minor's status with respect to his parents because "all relevant information" concerning the minor was in Utah, Utah had supported the minor for a number of years, and, "[p]erhaps most importantly," there was good reason to believe that if the Court refused to exercise jurisdiction, "no other state would be able to assert jurisdiction to resolve W.A.'s status." *Id.* at ¶ 29. Second, the court noted that the parents' procedural due process rights were satisfied because they had received actual notice of the termination proceeding and had an opportunity to present evidence at the hearing. *Id.* at ¶ 30.

¶ 62 I have explained above my belief that, under the UCCJEA, Utah is not the most appropriate jurisdiction for the resolution of Osborne's parental status in regard to his child. (In light of the proceedings that have already taken place in North Carolina, we surely cannot claim that Utah is the only state that can determine this issue.) I also believe that the lower court rulings allowing Osborne's parental rights to be terminated without notice unfairly deprived him of due process.

### III. DUE PROCESS—NOTICE

¶ 63 The particular facts of this case lead to the conclusion that the district court's decision to terminate Osborne's parental rights without notice and to allow the child's adoption to proceed without notifying Osborne or obtaining his consent violated Osborne's due process rights. The court of appeals' decision raises similar concerns. Osborne should not be held to strict adherence to statutory requirements, whether those of Utah Code Ann. § 78–30–4.14(2)(b) or Utah Code Ann. § 78–30–4.15(4), when Osborne has, according to the facts he presents,[6] developed a substantial relationship with his child.

¶ 64 In *Lehr v. Robertson,* the United States Supreme Court held that due process did not mandate notice of an adoption proceeding to a putative father, a New York resident, who had failed to register with New York's putative father registry and who had never lived with or provided financial support to the child. 463 U.S. 248, 252, 264, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). The Court characterized the putative father's parental interest in that case as "inchoate" because of the father's failure to establish a relationship with the child and concluded that New York's registry requirement adequately protected this inchoate interest. *Id.* at 265, 103 S.Ct. 2985.

¶ 65 The *Lehr* Court specifically declined to rule on the registry requirement's adequacy as applied to a developed father-child relationship. *Id.* at 262, 103 S.Ct. 2985. To the contrary, the Court stated: "When an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' his interest in personal contact with his child acquires substantial protection under the due process clause. At that point it may be said that he 'act[s] as a father toward his children.' " *Id.* at 261, 103 S.Ct. 2985 (quoting *Caban v. Mohammed,* 441 U.S. 380, 389 n. 7, 390, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979)).

¶ 66 Strict compliance with legal requirements is simply an inadequate measure of paternal rights where a father has provided support to the mother since the commencement of her pregnancy and lived with the mother and the child for nearly the entire five-month period before the mother came to Utah and relinquished the child for adoption. *See In re Adoption of S.L.F.,* 2001 UT App 183, ¶¶ 28–31, 27 P.3d 583 (Utah Ct.App. 2001) (Davis, J., concurring) (arguing that applying the full and strict compliance requirement of Adoption Code § 78–30–4.14(5) to deprive a putative father with a substantial relationship with his child of his right to notice violates due process).

¶ 67 Utah's putative father registry provision, codified at Utah Code Ann. § 78–30–4.13(3), requires an unmarried biological father who wishes to preserve his rights of notice and consent in regard to his child's

---

**6.** Since no trial court has made findings of fact in this case, my opinion rests on the assumption that the facts as presented by Osborne, which do not appear significantly different from those presented by the Adoption Center, are correct.

adoption to register his claim to paternity prior to the birth mother's relinquishment of the child to an adoption agency. We have previously upheld the facial validity of this requirement and its application to putative fathers who are Utah residents. *See Swayne v. L.D.S. Social Servs.*, 795 P.2d 637 (Utah 1990); *Wells v. Children's Aid Soc'y*, 681 P.2d 199 (Utah 1984); *Sanchez v. L.D.S. Social Servs.*, 680 P.2d 753 (Utah 1984). This court also upheld the registry requirement as applied to an out-of-state father who had substantial notice of the mother's presence in Utah and her intention to place the child for adoption. *See In re Adoption of B.B.D.*, 1999 UT 70, 984 P.2d 967 (Utah 1999).

¶ 68 On the other hand, we struck down the registry requirement's application to an out-of-state father when the father, relying on the mother's misrepresentation of her intentions, was in the process of moving to Arizona to establish a home for them and their child at the time the mother gave the child up for adoption. *In re Adoption of Baby Boy Doe*, 717 P.2d 686, 690–91 (Utah 1986). Similarly, in *Ellis v. Social Services Department*, 615 P.2d 1250, 1256 (Utah 1980), we held that an out-of-state putative father was entitled to a hearing to determine his parental rights, even though he had not complied with the registry requirement, when he did not know of the child's birth in Utah.

¶ 69 The current version of the Utah Adoption Code does allow an exception to the registry requirement for out-of-state unmarried biological fathers, based on the legislative finding that such a father "may not, in every circumstance, be reasonably presumed to know of, and strictly comply with, the requirements of this chapter." Utah Code Ann. § 78–30–4.15(4). The court of appeals here applied the requirements of that section and held that Osborne was ineligible for this exception because he had not, in the language of Utah Code Ann. § 78–30–4.15(4)(d), "complied with the most stringent and complete requirements of" his home state, North Carolina.

¶ 70 However, more than Osborne's out-of-state status is relevant here. The crucial fact is Osborne's five-month relationship with this child. In none of the above cases had the putative father developed any kind of relationship with the child, who in all cases was relinquished by the mother within days of its birth. Our precedent thus fails to address the situation at hand. In fact, in *Wells,* we specifically indicated that we were applying the same "rationale of variable parental rights" developed in *Lehr,* suggesting that this line of cases only applies to "unwed fathers 'whose relationships to their children are merely biological or very attenuated.' " 681 P.2d at 203 (quoting *In re J.P.,* 648 P.2d 1364, 1375 (Utah 1982)). That is not the case here. To terminate Osborne's fully developed parental rights without notice and a hearing, based on strict application of statutory requirements, violates notions of fundamental fairness, and I therefore decline to join with the majority.